**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

**SHARON K. RIDDICK**
*on behalf of herself and all others similarly situated,*

**Plaintiff,**

**v.** **Civil Action No. 2:24-cv-00700-EWH-RJK**

**CHEX SYSTEMS, INC.,**

**Defendant.**

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

Plaintiff Sharon K. Riddick, individually and on behalf of all others similarly situated and by Counsel, has moved the Court pursuant to Federal Rule of Civil Procedure 23 for an Order certifying a class of consumers for whom Defendant Chex Systems, Inc. produced consumer reports that contained inaccurate information related to accounts discharged by class members' Chapter 7 bankruptcies. For the reasons that follow, the Court should grant Plaintiff's Motion.

## I. Overview

This case challenges Chex Systems, Inc.'s ("Chex") systemic failure to assure accurate credit reporting of bank account debts that have been discharged in Chapter 7 bankruptcy. Chex is a nationwide "specialty" consumer reporting agency that provides banks and credit unions with reports on consumers' banking histories.[1] A derogatory Chex report can effectively bar a consumer from opening a checking or savings account. That is exactly what happened to Plaintiff Sharon K. Riddick: after she received a Chapter 7 bankruptcy discharge of an overdrawn checking account

---

[1] https://www.chexsystems.com/about-chexsystems (last accessed February 5, 2026).

debt owed to Suntrust Bank, Chex continued to report the debt as an outstanding, "Unpaid" charge-off – as if Ms. Riddick still owed the money. (Amended Class Complaint, ECF No. 16 at ¶¶ 5, 15, 16.) As a result, Ms. Riddick was denied a new bank account based on Chex's inaccurate report. (*Id.*, ¶¶ 12, 13.) Plaintiff brings this Fair Credit Reporting Act ("FCRA") class action on behalf of herself and thousands of similarly situated consumers who were harmed by Chex's uniform practice of reporting discharged bank-account debts as if they remained due and owing. (*Id.*, ¶ 6.) For the reasons below, the proposed class meets all of the requirements of Rule 23, and the Court should certify the class and appoint Ms. Riddick as class representative.

Chex's inaccurate reporting at issue is neither isolated nor accidental – it is the product of uniform, inadequate procedures that Chex applies to all consumers. ChexSystems admittedly "built [its] procedures around" its (flawed) understanding of a 2017 district court decision (*George v. ChexSystems*) that it believed allowed Chex not to check bankruptcy records for discharged debts. Ex. 1. Whyte Dep. 11:19-22, 12:7-21, 15:6-17:8. Relying on that single, fact-bound decision, ChexSystems chose not to implement any "bankruptcy scrub" procedures at all. Ex. 1, 12:7-21, 15:20-24. It simply continues to "parrot" whatever information furnishers (banks) provide, even if a debt was plainly discharged in a Chapter 7 case. Ex. 1, 45:23-48:15, 52:24-53:2; Ex. 2. Bruce Dep. 37:2-16. Chex does not use PACER or any automated bankruptcy feeds (including that of its own parent, Fidelity National Information Services ("FIS"), or the LexisNexis data it receives for other purposes, but ignores for its tradelines), despite the ready availability of such data and industry standards dating back over a decade requiring its use. Ex. 1, 50:17-51:6, 66:7-68:9; Ex. 2:79:10-11, 81:11-19, 83:4-88:11. In fact, the major credit bureaus (Experian, Equifax, Trans Union) agreed in the 2008 *White/Hernandez* class settlement to implement systemic procedures to ensure discharged debts are either deleted or reported with a zero balance. Ex. 3, *Terri N. White,*

*et al. v. Experian Information Solutions, Inc.,* Approval Order Regarding Settlement Agreement and Release. Yet Chex carried over none of those lessons; it continues to blindly report discharged overdraft accounts as open debts in its ChexSystems reports. Ex. 1, 45:23-48:15. Chex has received frequent consumer complaints and even other lawsuits alerting it to this precise problem, and thus Chex knew or should have known that its procedures were allowing systematic inaccuracies regarding bankruptcy-discharged debts. Ex. 4, Husaby Dep. 25:2-26:24. Nonetheless, Chex persisted in selling reports without implementing any procedure to identify and correct these common errors. ECF No. 16, ¶ 37. ChexSystems' uniform conduct has therefore affected a broad class of consumers in the same way, and their claims turn on the same common questions – most notably, whether Chex's blanket failure to update or verify bankruptcy information violates FCRA § 1681e(b). Ex. 5, Plaintiff's Rule 26(a)(2)(B) Expert Witness Report of Evan D. Hendricks, p. 4, 9-11. Such a class is eminently certifiable, and class treatment is not only the most efficient means of adjudication but the *only* means of vindicating these consumers' rights.

## II. CASE BACKGROUND

### A. Case Facts

Now of course is not the posture at which to assess and adjudicate the case on its merits. Some facts are relevant here, while others must await a later stage. As this Court has described,

> In conducting its analysis, the Court may face factual questions bearing on both class certification and the merits of the action. "A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." [ ]. Because of this, "the district court must take a 'close look' at the facts relevant to the certification question and, if necessary, make specific findings on the propriety of certification." [ ]. Such findings are necessary "even if the issues tend to overlap into the merits of the underlying case," but "the likelihood of the plaintiffs' success on the merits ... is not relevant to the issue of whether certification is proper." [ ]. The Court's factual determinations should go only as far as necessary and no farther.

*Soutter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 195 (E.D. Va. 2015), quoting *Wal–Mart Stores, Inc. v. Dukes,* 564 U.S. ——, 131 S.Ct. 2541, 2551 (2011) and *Thorn v. Jefferson–Pilot Life Ins. Co.,* 445 F.3d 311, 319 (4th Cir.2006). We aver the facts herein solely for the purpose of meeting the requirements of Rule 23.

*ChexSystems and Its Credit Reporting Practices*: ChexSystems is a consumer reporting agency ("CRA") subject to FCRA § 1681e(b)'s requirement to use *"reasonable procedures to assure maximum possible accuracy"* of the information it reports. Ex. 1, 20:11-15. Chex compiles and sells "specialty" consumer reports (called QualiFile reports) to financial institutions for use in deciding whether to open new customer accounts. Ex. 4, 27:18-22, 65:3-4, 67:13-14. These reports focus primarily on prior checking or savings account closures and related negative banking history. Ex. 4, 50:4-51:11. Although ChexSystems is smaller and less well-known than the "Big Three" credit bureaus, its reports have significant real-world impact. Ex. 5, p. 4-5, 9-11. A negative ChexSystems report, such as an outstanding charged-off balance, can lead banks to deny a consumer a standard checking account and force them into subprime banking alternatives. Ex. 5, p. 10. ChexSystems reports can effectively blacklist a consumer from the mainstream financial system for up to five years based on the reporting of a charged-off account. Ex. 2, 161:16-23.

*Defendant's Uniform Failure to Update Discharged Debts*: In handling bankruptcy information, ChexSystems follows a uniform policy that applies to all consumers: it makes *no* effort to proactively update or correct its reports after a consumer's Chapter 7 bankruptcy discharge. Ex. 1, 12:7-21, 15:20-24. ChexSystems has "ZERO procedures in place" to check its reported debts against bankruptcy court records. ECF No. 16, ¶ 26; Ex. 1, 45:23-48:15, 52:24-53:2. Instead, Chex relies entirely on its furnishing banks to report that an account was included in bankruptcy, or on consumers to dispute inaccuracies after the fact. Ex. 1, 52:24-53:2; Ex. 2.

Bruce Dep. 37:2-16. This approach has created a systemic problem. When a bank fails to notify Chex of a bankruptcy, ChexSystems will continue reporting the debt as an outstanding, delinquent account indefinitely – even though a Chapter 7 discharge means the consumer no longer owes that debt. Ex. 1, 52:24-53:2. Chex does not utilize any of the readily available resources to prevent this. Ex. 1, 50:17-51:6, 66:7-68:9; Ex. 2:79:10-11, 81:11-19, 83:4-88:11. It does not cross-reference the public bankruptcy dockets, Ex. 1., 11:17-22, even though the fact of a bankruptcy discharge (and its date and included debts) is easily and inexpensively obtainable via PACER or third-party services. Ex. 6, Expert Witness Report of H. David Cox, Esq. Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), p. 7. ChexSystems does not use or subscribe to any bankruptcy "scrub" or updating service, nor does it leverage the bankruptcy data it *already purchases* for other purposes. Ex. 1, 15:20-16:7; Ex. 2:79:10-11, 81:11-19, 83:4-88:11. For example, Chex receives bankruptcy-related "stability" and risk attributes from LexisNexis and other partners (including indicators of whether and when a consumer filed bankruptcy), but chooses not to use those data points to update or verify the status of prior charged-off accounts. Ex. 2, 79:7-21; Ex. 5, p. 3. And its Parent company, FIS, which is the actual operator of the Chex business and official employer of 100% of its employees advertises its private Bankruptcy database as the best in the industry.[2] Chex uses neither to ensure the accuracy of its tradelines. Ex. 2, 83:4-88:11.

ChexSystems' President confirmed in testimony that the company effectively *"built [its] procedures"* around doing nothing – interpreting the 2017 *George v. ChexSystems* decision as meaning Chex did not "have to" check PACER or other sources, and therefore implementing no affirmative bankruptcy-update process. Ex. 1, 11:17-22. This Court of course rejected that reliance

---

[2] https://www.fisglobal.com/-/media/fisglobal/files/pdf/product-sheet/ethos-bankruptcy-intelligence-product-sheet.pdf (last accessed February 5, 2026).

and the relevance of that distant past case decided without the benefit of the allegations here. (ECF No. 54, FN 3.) Even after this Court's October 10, 2025 Opinion in the present case highlighted the inadequacy of Chex's approach and allowed Plaintiff's willfulness claim to proceed, ChexSystems has not changed its practices. Ex. 1, 68: 10-19. It continues to rely solely on furnishers and consumers to catch its mistakes, placing the burden on the least informed parties to correct errors entirely within Chex's control. Ex. 1, 52:24-53:2. In short, ChexSystems has made a deliberate business decision *not* to incorporate basic, widely-used accuracy procedures for discharged debts – a decision that affects every member of the proposed class in the same manner.

*Plaintiff's Experience*: Plaintiff Sharon Riddick is a typical example of ChexSystems' practices and their harmful effects. Ms. Riddick filed for bankruptcy and obtained a bankruptcy discharge under Chapter 7 in September 2019 from the U.S. Bankruptcy Court for the Eastern District of Virginia. (ECF No. 16, ¶ 21.) Among the debts discharged in that proceeding was an overdrawn checking account debt she owed to SunTrust Bank (now Truist). (*Id.*, ¶ 5.) In other words, as of her discharge in 2019, Ms. Riddick was no longer personally liable for the SunTrust account debt. Ex. 6, p. 6.

However, more than four years later, ChexSystems was still reporting the SunTrust account as a live, delinquent debt. (ECF No. 16, ¶ 12-16.) In early 2024, Ms. Riddick applied for a new bank account with Chartway Federal Credit Union (in January and again in March 2024). (*Id.*, ¶ 12, 14.) Both applications were denied. (*Id.*, ¶ 13.) A Chartway representative informed Ms. Riddick that the denial was based on a derogatory item in her ChexSystems report – specifically, an indication that Ms. Riddick had an unpaid, charged-off account with SunTrust. (*Id.*) Ms. Riddick obtained a copy of her ChexSystems consumer file on March 25, 2024, which confirmed what Chartway had said. (*Id.*, ¶ 14.) ChexSystems was reporting the SunTrust checking account

with an "Original Charge Off Amount" of $458.66, a status of "UNPAID," and a last status date of July 12, 2019. (*Id.*, ¶ 16.) In the credit reporting industry, a reported status of "Unpaid" charge-off indicates that the consumer still owes the debt and remains liable for payment. *Id.*, ¶ 17; Ex. 5, p. 6. Thus, despite Ms. Riddick's Chapter 7 discharge, ChexSystems was portraying her SunTrust debt as a currently outstanding obligation – which was patently inaccurate. Ex. 5, p. 6; Ex. 6, p. 6. Chartway, relying on Chex's report, viewed Ms. Riddick as a consumer who *currently owes a delinquent debt* and has a history of failing to pay as agreed, leading the credit union to deny her account application. Ex. 5, p. 6, 9. Ms. Riddick suffered exactly the kind of injury the FCRA's accuracy provisions are designed to prevent: she was barred from ordinary financial services because of outdated, misleading credit information that should have been corrected long before. Ex. 5, p. 4.

Notably, ChexSystems easily could have avoided this outcome. By the time Ms. Riddick applied for the new account in 2024, her bankruptcy discharge (and the inclusion of the SunTrust account in that discharge) had been a matter of public record for years. ChexSystems needed only to check its data against the bankruptcy court's records – a simple, automated process widely used in the credit industry – to know that the SunTrust debt was no longer enforceable. Ex. 6, p. 8. But Chex did not check. It had no procedure to update furnished data even when a known, intervening event (a Chapter 7 discharge) rendered that data inaccurate. Ex. 1, 12:7-21, 15:20-24. Instead, ChexSystems continued to report the stale information it received from SunTrust back in 2019, with no notation of the bankruptcy. Ex. 1, 11:7-22; Ex. 2, 120:22-121:4. Ms. Riddick only discovered the error after suffering a denial. (ECF No. 16, ¶ 14.) She then had to dispute the inaccuracy to get it corrected – illustrating the backwards nature of Chex's system, which forces consumers to obtain and provide proof of their own bankruptcy to fix reports that should never

have been wrong in the first place. Ex. 1, 57:24-58:19. Plaintiff's experience thus typifies the class-wide issues: ChexSystems treated her the same as every other class member, by failing to take reasonable steps to ensure her discharged debt was reported accurately, and as a result she was subjected to the *same kind of harm* – loss of access to banking services – that many other class members have likely faced. Ex. 5, p. 9.

**B. Plaintiff's Claims and Proposed Class**

Plaintiff seeks certification of the class defined in the proposed Second Amended Complaint,[3] which is limited to consumers whose ChexSystems reports improperly listed a discharged Chapter 7 debt as if it were still owing. The proposed 1681e(b) Class is defined as:

> All natural persons who (1) were the subject of a consumer report furnished by Defendant to a third party within five years before the filing of this action; (2) where the report indicated an outstanding balance or a past due indication on an account existing on the date such person filed a Chapter 7 bankruptcy (whether or not such account was scheduled as a debt) which resulted in the entry of a Discharge Order; and (3) where there is no reaffirmation agreement that makes the account enforceable notwithstanding the discharge and no adversary proceeding in which the account is determined to be non-dischargeable.

The class specifically excludes any individuals who have signed written releases of their claims, as well as any putative class members who are judges or court personnel assigned to this case. (ECF No. 94-1, ¶¶ 63.) In addition, Plaintiff seeks to certify a corresponding Virginia Subclass defined as all class members "with a primary address located in Virginia" in Defendant's records (covering Virginia residents within the above-defined two-year period who meet the same Chapter 7 discharge criteria). (*Id.*, ¶ 64.) Both the class and subclass definitions rely on objective criteria and data readily available from Defendant's own files (e.g. identifiers of reports containing

[3] Contemporaneously with the filing of the instant Motion, Plaintiff has filed a Motion for Leave to Amend Complaint (ECF No. 94). The proposed Second Amended Complaint is attached as an Exhibit thereto.

account closures, and indicators of whether the subject debts pre-dated a Chapter 7 filing and discharge). Ex. 6, p. 8. [redacted] Ex. 7 Expert Report of Jonathan Jaffe, ¶ 28, FN 24 (citing Chex's response to Plaintiff's interrogatory 10). [redacted] Ex. 7, ¶¶ 27-40. [redacted] Ex. 7, ¶¶ 27-40. [redacted] Ex. 7, ¶¶ 28-29. In short, the class is not only clearly defined – it is also ascertainable from Defendant's records with an accuracy that expert analysis has already confirmed.

## III. Argument and Authorities

"To obtain class certification, a plaintiff must satisfy the four requirements" of Rule 23(a) of the Federal Rules of Civil Procedure, and the case "must also fall within at least one of the types of class actions defined in Rule 23(b)." *Branch v. Gov't Employees Ins. Co.*, 323 F.R.D. 539, 544 (E.D. Va. 2018). The Court must undertake a "rigorous analysis" as to each requirement. *Wal-Mart Stores, Inc., v. Dukes*, 564 U.S. 338, 351 (2011) (internal quotations omitted). Because of the rigorous analysis required by *Dukes*, "the district court must take a 'close look' at the facts relevant to the certification question and, if necessary, make specific findings on the propriety of certification." *Branch*, 323 F.R.D. at 545 (quoting *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d

311, 319 (4th Cir. 2006)). Although this analysis may "overlap into the merits of the underlying case," the "likelihood of the plaintiff's success on the merits . . . is not relevant to the issue of whether certification is proper." *Id.* (quoting *Thorn*, 445 F.3d at 319). Stated differently, Rule 23 does not provide courts with a "license to engage in free-ranging merits inquiries at the certification stage," and merits questions should only be considered "only to the extent" that "they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013).

Federal courts have long regarded "consumer claims" as "particularly appropriate for class resolution." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *In re Mexican Money Transfer Litig.*, 267 F.3d 743, 747 (7th Cir. 2001); *Cavin v. Home Loan Ctr., Inc.*, 236 F.R.D. 387, 395–96 (N.D. Ill. 2006) ("Consumer claims are among the most commonly certified for class treatment"). As explained below, this case is no different as Plaintiff's claims satisfy the four prerequisites of Rule 23(a) and is one of the types of class actions allowed by Rule 23(b).

**A. The Putative Class Meets The Requirements Of Rule 23(a)**

**1. The Class is sufficiently numerous and ascertainable.**

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." *Talbott v. GC Servs., Ltd. P'ship.*, 191 F.R.D. 99, 102 (W.D. Va. 2000). The numerosity hurdle is not a high one, as joinder of a class population of 18 or more is presumptively impracticable. *Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967) (finding that 18 class members was sufficient to fulfill the numerosity requirement); *see also Clark v. Trans Union, LLC*, No. 3:15CV391, 2017 WL 814252, at *7 (E.D. Va. Mar. 1, 2017) ("[J]oinder usually becomes impracticable where the class exceeds 40 members[.]) (citation omitted).

"[I]t is well settled that a plaintiff need not allege the exact number or specific identity of proposed class members." Newberg on Class Actions § 3:13 (5th ed.) In fact, "certification denials on this basis are rare and courts are generally forgiving where plaintiffs are unable to do more than set forth commonsense assumptions." *Id*; *see also Scott v. Clarke*, 61 F. Supp. 3d 569, 584 (W.D. Va. 2014) ("Where the exact size of the class is unknown but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied" (quoting Newberg on Class Actions) (cleaned up); *Violette v. P.A. Days, Inc.*, 214 F.R.D. 207, 213 (S.D. Ohio 2003) (stating that "it is permissible for a plaintiff to make reasonable inferences drawn from available facts" and that "an information monopoly [by the party opposing the class] will not stand in the way of persons seeking relief") (cleaned up).

[redacted] Ex. 7, ¶¶ 28-29. [redacted] Ex. 7, ¶ 28. [redacted] Ex. 7, ¶ 29. Even under far more conservative assumptions, the class comfortably exceeds the typical numerosity threshold (courts routinely find numerosity when classes exceed about 40 members). Here, joinder is not remotely feasible given the geographic dispersal and sheer number of class members (likely 9,000+ individuals). Moreover, the class includes many consumers who may not even be aware that ChexSystems misreported their discharged debt – underscoring the impracticability of relying on individual actions. Numerosity is plainly met.

The proposed class is also ascertainable, an element implied in the numerosity element at Rule 23(a). That is, "that there be an identifiable class" against which the Court should apply its

analysis. 7A C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2d § 1760 (2d ed. 1986). As the Fourth Circuit has explained the concept:

> Rule 23 contains an implicit threshold requirement that the members of a proposed class be "readily identifiable." Our sister circuits have described this rule as an "ascertainability" requirement. However phrased, the requirement is the same. A class cannot be certified unless a court can readily identify the class members in reference to objective criteria. The plaintiffs need not be able to identify every class member at the time of certification. But "[i]f class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate."

*EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (citations omitted). The question for the Court is whether it "is administratively feasible for the court to determine whether a particular individual is a member." *Id.* The purpose of the implied ascertainability requirement "is not to 'identify every class member at the time of certification,' but to define a class in such a way as to ensure that there will be some 'administratively feasible [way] for the court to determine whether a particular individual is a member' at some point." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 658 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 676 (2019) (quoting *EQT*, 764 F.3d at 358).

"Where the plaintiff has demonstrated that the class of persons he or she wishes to represent exists, that they are not specifically identifiable supports rather than bars the bringing of a class action, because joinder is impracticable." *Doe v. Charleston Area Med. Ctr., Inc.*, 529 F.2d 638, 645 (4th Cir. 1975) (citing cases under both Rule 23(b)(2) and 23(b)(3)). A class like this one is ascertainable because it is "defined by the activities of the defendant[.]" *Alliance to End Repression v. Rochford*, 565 F.2d 975, 978 (7th Cir. 1977); *see also Lewis v. Tully*, 96 F.R.D. 370, 376 (N.D. Ill. 1982) *on reconsideration,* 99 F.R.D. 632 (N.D. Ill. 1983) ("[A] class that is defined by the contested practices of the defendant is sufficiently ascertainable.").

The class is defined by objective criteria – essentially, the presence of a specific data error (an unpaid account closure that pre-dated a Chapter 7 discharge) in a ChexSystems report during

a fixed time frame. Determining class membership does not require mini-trials or subjective judgments; it is a ministerial matter of analyzing Defendant's records and public bankruptcy records. Ex. 6, p. 8-9; Ex. 7, ¶¶ 27-40, 49-81. [redacted] Ex. 7, ¶¶ 89, 90, 92; Ex. 8 Edwinson Dep. 12:19-22, 15:12-19. [redacted] Ex. 7, ¶¶ 85-93, 96-100, 152-156, 214-220. [redacted] Ex. 7, ¶¶ 83-90, 96-100, 214-220. [redacted] Ex. 7, ¶ 40. In other words, the class members are readily identifiable through Defendant's own databases and a straightforward comparison to bankruptcy court records. No broad notice/publication process will be needed to guess at class membership; it's a matter of querying ChexSystems' data. This readily satisfies the Fourth Circuit's implicit requirement that a class be "readily identifiable" by objective means.

**2. There are questions of law and fact common to the Class**

Rule 23(a)(2) requires that common questions of law *or* fact exist among class members, and a single question on either point suffices. *Jeffreys v. Commc'ns Workers*, 212 F.R.D. 320, 322 (E.D. Va. 2003); *Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 143 F.R.D. 628, 636 (D.S.C. 1992), *aff'd* 6 F.3d 177 (4th Cir. 1993) (stating that commonality "does not require that all, or even most, issues be common, nor that common issues predominate, but only that common issues exist").

More recently, the Fourth Circuit has restated the standard for commonality, based upon the Supreme Court's clarification of the concept:

> Commonality is generally established when a plaintiff's claims have "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). As the Supreme Court recently clarified, in order to satisfy the commonality requirement, the plaintiff must "demonstrate that the class members 'have suffered the same injury,' " *Wal–Mart Stores, Inc., v. Dukes,* ——U.S. ——, ——, 131 S. Ct. 2541, 2551, 180 L.Ed.2d 374 (2011) (quoting *Gen. Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 156, 102 S. Ct. 2364, 72 L.Ed.2d 740 (1982)), and that the claim "depend[s] upon a common contention" that "is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke," *id.*

*Gray v. Hearst Commc'ns, Inc.*, 444 F. App'x 698, 700–01 (4th Cir. 2011). "A single common question will suffice but it must be of such a nature that its determination 'will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Adair*, 764 F.2d at 360 (internal citations omitted).

Commonality is a liberal standard, and the fact that there are some factual variations in individual grievances among class members does not defeat commonality. *Jeffreys*, 212 F.R.D. at 322. Not all factual or legal questions raised in the litigation need be common so long as at least one issue is common to all class members. *McGlothlin v. Connors*, 142 F.R.D. 626 (W.D. Va. 1992). The commonality requirement demands that the class present dispositive questions which will propel the case through the system. *See Stott v. Haworth*, 916 F.2d 134, 145 (4th Cir. 1990); *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 (4th Cir. 2001). "'Minor differences in the underlying facts of individual class members cases do not defeat a showing of commonality where there are common questions of law.'" *DiFelice v. U.S. Airways, Inc.*, 235 F.R.D. 70, 78 (E.D. Va. 2006).

This case revolves around common questions that will yield common answers for all class members. Further, as addressed fully below (regarding typicality), the question of willfulness is a

core common issue. This Court has ample experience with commonality in the FCRA context. In 2014, in a case in which the applicability of the FCRA was in dispute, this Court found, "[a]s to the Rule 23(b)(3) class, the class members have suffered the same injury, based on Defendants' treatment and sale of class members' information without treatment required by the FCRA; their claims depend on a common contention—namely, that Defendants' treatment and sale of information is subject to the FCRA." *Berry v. LexisNexis Risk & Info. Analytics Grp., Inc.*, 3:11-CV-754, 2014 WL 4403524, at *10 (E.D. Va. Sept. 5, 2014). Not long after, the Court certified an FCRA class action against Equifax in which the plaintiff pressed a similar Section 1681e(b) inaccuracy claim. *See Soutter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 191 (E.D. Va. 2015). There, the Court defined the core commonality issues as "the inaccuracy of the consumer reports, the reasonableness of the procedures alleged to cause these inaccuracies, whether Equifax's conduct was willful, and the determination of statutory damages." *Id.* at 201.

The *core factual issue* is the existence and adequacy of ChexSystems' procedures (or lack thereof) for reporting discharged debts – a question that is the same for every class member, since Chex applied the *same* non-existent bankruptcy update policy to everyone. Ex. 1, 45:23-50:24, 52:24-54:6. Likewise, the *core legal issue* – whether ChexSystems' conduct violates FCRA § 1681e(b)'s "reasonable procedures" mandate – is a classwide question with a single answer, not dependent on any class member's unique circumstances. Ex. 5, p. 7-9. As the Complaint identified, common questions include: "(a) whether Defendant had reasonable procedures to assure that it did not wrongfully list discharged debts as due and owing; (b) whether this conduct constituted a violation of the FCRA; and (c) whether the violation was negligent, reckless, or willful." (ECF No. 16, ¶ 66.) Each of those questions is common to all putative class members. Answering them will resolve central issues - *in one stroke* - for the entire class. Notably, ChexSystems does not

(and cannot) contend that it had different procedures for different consumers – the *absence* of any bankruptcy scrub is a uniform company policy. Ex. 1, 45:23-50:24, 52:24-54:6. Thus, every class member's claim raises the *same common contention*: that Chex's standard reporting procedure (relying solely on furnishers and failing to verify bankruptcy discharges) was unreasonable under § 1681e(b). Ex. 5, p. 7-9. In addition, all class members were injured by the same pattern of inaccurate reporting, which presents common fact questions about the tendency of Chex's reports to mislead creditors and the types of harm that naturally flow from having a discharged debt reported as unpaid (loss of banking opportunities, reputational harm, etc.). Ex. 5, p. 9-11. While each consumer's personal harm need not be individually proven here (as discussed under predominance, Plaintiff seeks statutory and punitive damages on a classwide basis), the overarching fact remains that ChexSystems' conduct had a classwide impact. Because at least one common question of law or fact unites the class – indeed, here *many* do – Rule 23(a)(2) is satisfied. *See Jeffreys v. Comm'cns Workers of Am.*, 212 F.R.D. 320, 322 (E.D. Va. 2003) (only one common question needed, and it may be a common issue of fact or of law). Here, both common facts and common legal issues abound.

**3. Plaintiff's claims are typical of Class Members' claims because the claims share materially similar, if not identical, facts to support a *prima facie* case.**

Among the various elements to be necessarily analyzed by the Court's "rigorous analysis," typicality remains a threshold that is usually met. *See Brown v. Nucor Corp.*, 576 F.3d 149, 153 (4th Cir. 2009) ("The threshold requirements of commonality and typicality are not high . . . .") (quoting *Shipes v. Trinity Indus.*, 987 F.2d 311, 316 (5th Cir. 1993)); a*ccord Romero v. Mountaire Farms, Inc.*, 796 F. Supp. 2d 700, 714 (E.D.N.C. 2011); *McLaurin v. Prestage Foods, Inc.*, 271 F.R.D. 465, 475 (E.D.N.C. 2010).

In its *Soutter* decision, the Fourth Circuit did not change or impose any new requirement to establish typicality. Instead, the roadmap for this Court's typicality analysis remains as follows:

> To determine if Soutter has shown typicality, we compare her claims and Equifax's defenses to her claims with those of purported class members by reviewing the elements of Soutter's prima facie case and the fact supporting those elements and examining 'the extent' to which those facts "would also prove the claims of the absent class members."

*Soutter v. Equifax Info. Servs., LLC*, 498 F. App'x 260, 265 (4th Cir. 2012) (citing *Deiter v. Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir. 2006)).

Applying the Fourth Circuit's roadmap, Plaintiff's claim and facts are clearly typical of the putative Class's claims and facts. As the Fourth Circuit held, "Soutter's claim under § 1681e(b) requires her to prove that:

> (1) her credit report was inaccurate;
> (2) Equifax's unreasonable procedures caused the inaccuracy; and
> (3) Equifax's behavior was willful."

*Id*. (numbered structure added). This case is that simple. Each of these elements is uniform and the same across the Class. Typicality is therefore satisfied.

**a. Plaintiff's and Class Members' credit reports were inaccurate in the same material way.**

Plaintiff Riddick's claims are typical of the class claims because they arise from the same course of conduct and are based on the same legal theory. Rule 23(a)(3)'s typicality requirement is closely related to commonality – it asks whether the lead plaintiff's situation is "squarely aligned" with the class's, such that by advancing her own claims she also advances the class's claims. That is the case here. Plaintiff's claim is identical in all material respects to those of other class members. Like all class members, Ms. Riddick alleges that ChexSystems violated § 1681e(b) by reporting an already-discharged debt as if it were still owed, and that Chex did so because it

failed to maintain reasonable procedures to assure accurate reporting of bankruptcy information. Ex. 5, p. 4-5; Ex. 9 Riddick Dep. 46:17-47:5.

Plaintiff's credit report was inaccurate in the identical way that the credit report of each putative Class Member was inaccurate. Ex. 5, p. 4. By nature of the Class definition, every putative Class Member is in the exact same circumstance: Chex furnished a credit report about each of them stating that an account on which an unpaid balance or past due indication that preceded them filing Chapter 7 bankruptcy was still owed, still delinquent, or charged off, when this was objectively untrue according to the consumer's bankruptcy filings. [redacted] Ex. 6, p. 8-9; Ex. 7, ¶¶ 27-40, 49-81. The evidence that will prove Ms. Riddick's claim (such as Chex's written policies, its database practices, its responses to consumer disputes, and expert analysis of its data) will simultaneously prove the claims of the class. Furthermore, the relief sought is the same for Plaintiff and the class. (ECF No. 16, ¶ 72.) Plaintiff and all class members seek statutory damages (and, if proven, punitive damages) under the FCRA's uniform remedial provisions, based on Chex's willful violation of the statute. (*Id.*) Importantly, Plaintiff is not pursuing any individualized actual damage claims in this class action – she seeks only the statutory and punitive damages that *every* class member is entitled to upon showing a willful FCRA violation. (*Id.*) This eliminates any risk that individual variations in harm could make Plaintiff atypical. In sum, Plaintiff stands in the shoes of the class: her claim is *co-extensive* with those of the class, and there are no unique defenses or facts that set her apart. ChexSystems has no credible argument otherwise.

Thus, the first element that the Plaintiff is required to show for her § 1681e(b) claim—that her credit report was inaccurate—is typical of the putative Class Members' claims, as their reports were inaccurate in the exact same objective way as the Plaintiff's.

**b. Chex's unreasonable procedures caused the inaccuracies.**

Plaintiff's facts establish that "[Chex]'s unreasonable procedures caused the inaccuracy," *Soutter*, 307 F.R.D. at 205, and would similarly do so for the Class. For this element, as with *Soutter*, the information Chex obtained regarding the statuses of accounts for consumers with bankruptcies is key. *See id.* While this element was the primary basis for the Fourth Circuit's reversal of this Court's original class certification decision in *Soutter*, a refined class definition and more-complete record ultimately overcame any earlier shortcomings. *See Soutter*, 307 F.R.D. at 193 (setting out new evidence).

Here, the procedures analysis is far-less difficult than in *Soutter*. Plaintiff's claim does not depend on any unique facts particular to her; it challenges the credit reporting procedures of Defendant and does not depend on any individualized facts. Chex's President, Ronald Whyte, confirmed that Chex relies on furnishing banks to notify it when an account has been included in bankruptcy and does not independently verify discharge status using public bankruptcy records; absent furnisher notification or a consumer dispute, the account remains reported. Ex. 1, 46:2–48:15. Likewise, Chex's Director of Product Management, Brenda Bruce, testified that Chex's QualiFile and related products uniformly reflect furnisher-provided closure data and do not incorporate any independent bankruptcy check or override, meaning the same reporting workflow applies across products and consumers. Ex. 2, 37:2–16, 79:10-11, 81:11-19, 83:4-88:11. Because Ms. Riddick was injured by the same furnisher-dependent process that governs Chex's reporting for every class member, her claim is typical of the class.

Essentially, the question regarding reasonableness is whether Chex should be relying on what a furnisher says about the status of an account on which an unpaid balance or past due indication that preceded a consumer filing Chapter 7 bankruptcy when official court documents

that Chex either possesses or has access to objectively show otherwise (the unpaid balance preceded the consumer's Chapter 7 bankruptcy filing, a discharge was entered, no reaffirmation agreement makes the account enforceable notwithstanding the a discharge, and there are no adversary proceedings in which the account is determined non-dischargeable). (See ECF No. 54.) The answer of course is "no," Chex should not rely on furnishers in such circumstances. Yet, even if Chex may ultimately win on the question of reasonableness, that is still a question that applies to Plaintiff and all Class Members equally. Accordingly, the second requirement of Plaintiff's § 1681e(b) claim—that Chex's unreasonable procedures caused the inaccuracy—is typical of the putative Class Members' claims.

**c. Chex's conduct was willful as to Plaintiff and the proposed Class.**

The third element of Plaintiff's claim is whether Chex's "behavior was willful." *Soutter*, 498 F. App'x at 265. To be frank, finding that willfulness is individualized, particularly given that Chex has admitted to its reliance on furnishers to state whether accounts are "included in" or "discharged by" bankruptcies rather than learning that information for itself runs contrary to nearly every appellate and district court authority to have considered this question, including—post-*Soutter*—the Fourth Circuit's decision *Ealy v. Pinkerton Gov't Servs., Inc.*, 514 F. App'x 299, 305 (4th Cir. 2013) (favorably quoting *Stillmock v. Weis Markets, Inc.*, 385 Fed. App'x. 267 (4th Cir. 2010) with a unanimous decision, including Judge Wilkinson, who wrote the special concurrence in *Stillmock* mentioned in *Soutter*). Indeed, since the Supreme Court's decision in *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68 (2007), a near consensus of courts have found willfulness to be an objective or common issue. *See, e.g.*, *Stillmock*, 385 F. App'x at 273 (finding that FCRA willfulness is an "overarching" common issue.); *Dreher*, 2014 WL 2800766 at *3 & n.5 (granting class certification and finding "The 'overarching issue' in this case concerns Experian's willfulness:

whether Experian acted in objectively reasonable fashion . . . There is no real debate that the answer to this question is common to all proposed plaintiffs."); *Dreher*, 2014 WL 2800766 at *4 ("Arguments about a defendant's subjective bad faith have no place in the willfulness analysis.") (citing *Safeco,* 551 U.S. at 70, n.20)); *Boyd v. CEVA Freight, LLC*, 3:13-cv-00150-JAG, 2013 WL 6207418, at *5 (E.D. Va. Nov. 27, 2013) (same); *Williams v. LexisNexis Risk Mgmt. Inc.*, CIV A 306CV241, 2007 WL 2439463, at *6 (E.D. Va. Aug. 23, 2007) ("Accepting *arguendo* LexisNexis' characterization that *Safeco* requires a tiered inquiry, the Court nonetheless fails to see why recklessness requires inquiry into individual circumstances.").

This near consensus also holds true outside this Circuit and District. *See Gillespie v. Equifax Info. Servs., LLC*, 05 C 138, 2008 WL 4614327, at *7 (N.D. Ill. Oct. 15, 2008) ("Equifax also argues that individualized proof of willfulness will be required and will predominate over common questions. But willfulness will not turn, as CRA defendants often assert, on whether class members can show that Equifax deliberately meant to harm them in particular. Rather, it turns on whether Equifax knowingly or recklessly disregarded its statutory obligations under FCRA. *See Safeco*, 127 S. Ct. at 2208–09. That is plainly a common issue in this case, not an individual one, as it concerns a standardized practice that Equifax used. In short, willfulness is perfectly suitable for class-wide proof in this case."); *Summerfield v. Equifax Info. Servs., LLC*, 264 F.R.D. 133, 142–43 (D.N.J. 2009) ("Nothing about Plaintiffs' behavior or conduct impacts the case; it is Defendant's actions that are judged."); *Chakejian v. Equifax Info. Servs., LLC*, 256 F.R.D. 492, 500 (E.D. Pa. 2009) ("To prove willfulness here, a consumer-by-consumer inquiry is not necessary."); *Harris v. Experian Info. Solutions, Inc., et al.*, Civil No. 6:06-CV-01808-GRA, (D.S.C. May 29, 2008) (Doc. No. 118 at 17) ("Whether each Defendant acted willfully or negligently is one that is the same for each class member."); *Clark v. Experian Info. Sols., Inc.*, CIV.A.8:00-1217-24, 2002 WL 2005709,

at *4 (D.S.C. June 26, 2002) (same); *see also Levine v. World Fin. Network Nat. Bank*, 437 F.3d 1118, 1119 (11th Cir. 2006) (finding that FCRA willfulness is an objective question); *Fuges v. Sw. Fin. Servs., Ltd.*, 707 F.3d 241, 251 (3d Cir. 2012) ("*Safeco* does not require that the defendant actually have made such an interpretation at any particular point in time."); *Hammer v. Sam's E., Inc.*, 754 F.3d 492, 501–03 (8th Cir. 2014) (same). Nothing Chex could present here counsels departing from this settled path.

Simply put, the facts necessary for Plaintiff to prove that Chex's FCRA violation was willful are the same as would prove this element for anyone in the putative Class. Accordingly, the third element of Plaintiff's § 1681e(b) claim—that Chex's conduct was willful—is typical of the putative class members' claims.

**4. Plaintiff will adequately represent the Class.**

The final component of Rule 23(a) requires that the "representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). This prerequisite is met when: "(1) the named plaintiff[s] [have] interests common with, and not antagonistic to, the Class' interests; and (2) the plaintiff[s'] attorney is qualified, experienced and generally able to conduct the litigation." *In re Se. Hotel Props. Ltd. Pushup Investor Legit.*, 151 F.R.D. 597, 607 W.D.N.C. 1993); *Wiseman v. First Citizens Bank & Trust Co.*, 212 F.R.D. 482, 489 (W.D.N.C. 2003). Both prongs are met here.

Plaintiff's interests are fully aligned with those of the class. Ms. Riddick seeks to remedy the same wrong that all class members suffered – ChexSystems' inaccurate post-bankruptcy reporting – and to obtain the same type of statutory damages for the class as a whole. Ex. 9, 45:13-47:5. There is no divergence between her interests and the class's interests; in fact, her commitment to stopping Chex's unlawful practice demonstrates her adequacy. Ms. Riddick has shown her

dedication by actively participating in this case, including responding to discovery and sitting for deposition, See generally Ex. 9, and she understands her fiduciary duty to act in the best interests of the class. Ex. 9, 224:17-23. She has no interests antagonistic to other class members.

Plaintiff's counsel are competent and qualified. Plaintiff is represented by Consumer Litigation Associates, P.C. – a law firm with extensive experience litigating FCRA cases and other consumer protection class actions under the Consumer Credit Protection Act, 15 U.S.C. § 1601 *et seq.*, and has been approved as Class counsel in multiple cases before this Court.[4] *See Henderson v. Trans Union LLC*, No. 3:14-cv-00679-JAG, 2016 WL 2344786, at *5 (E.D. Va. May 3, 2016) (finding this same Plaintiff's Counsel adequate, noting "class counsel certainly qualifies as experienced in the arena of class action litigation under the FCRA"); *Dreher v. Experian Info. Sols., Inc.*, No. 3:11-cv-00624-JAG, 2014 WL 2800766, at *2 (E.D. Va. June 19, 2014) (appointing this same Plaintiff's Counsel as class counsel, explaining "Dreher's counsel is well-experienced in the arena of FCRA class action litigation"); *Soutter*, 307 F.R.D. at 212. They are thoroughly familiar with the applicable law and have already devoted substantial effort to identifying and investigating the class claims (for example, working with expert data analysts and industry experts). Plaintiff's counsel have no conflicts of interest and have demonstrated that they will vigorously prosecute this action on behalf of the class. In short, "[n]either Plaintiff nor her counsel have any interests that might cause them not to vigorously pursue this action", and Plaintiff "is aware of her responsibilities to the putative class and [has] accepted those responsibilities." Rule 23(a)(4) is therefore satisfied.

### B. The Class Also Satisfies Rule 23(b)(3).

---

[4] The concurrently filed Declaration of Leonard A. Bennett sets forth proposed Class Counsel's experience and ability to serve as Class Counsel. Ex. 10, Bennett Decl.

Under Rule 23(b)(3), an action that satisfies the threshold prerequisites for certification may be maintained as a class action if the court finds that: (1) ”the questions of law or fact common to the members of the class predominate over any questions affecting only individual members”; and (2) ”a class action is superior to other available methods for the fair and efficient adjudication of the controversy.” Plaintiff's claim satisfies those requirements.

**1. Common questions of law or fact predominate over individual ones.**

The focus of the Rule 23(b)(3)'s predominance inquiry is on whether the proposed classes are "sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. Thus, "[w]hen common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998). As this Court has put it, "[i]f the 'qualitatively overarching issue' in the litigation is common, a class may be certified notwithstanding the need to resolve individualized issues." *Soutter*, 307 F.R.D. at 214. The test is qualitative rather than quantitative, in which the Court "compares the quality of the common questions to those of the noncommon questions." *Id.* This predominance criterion is normally satisfied when there is an essential common factual link between all class members and the defendants for which the law provides a remedy. *Talbott*, 191 F.R.D. at 105 (citing *Halverson v. Convenient FoodMart, Inc.*, 69 F.R.D. 331 (N.D. Ill. 1974)).

Here, the common questions are not just significant – they are dispositive for every class member's claim. As discussed under commonality, the central liability questions (Did ChexSystems violate § 1681e(b) by using unreasonable procedures? Was its conduct willful?) are common to the class. These questions predominate because Chex's liability will be decided

overwhelmingly by reference to common evidence: e.g., ChexSystems' corporate policies and data practices; testimony from Chex's corporate representatives (such as its President and compliance personnel) regarding what procedures Chex does or does not employ; statistical evidence and expert analysis showing the frequency of the inaccuracy; and industry-standard evidence (such as the *White* settlement and regulatory guidance) showing that Chex's approach fell below reasonable standards. None of that evidence varies by individual class member. By contrast, there are no material individual questions that could predominate or overwhelm the common issues. Each class member's claim requires proving the same two elements: (i) that ChexSystems furnished an inaccurate report about them (listing a discharged debt as owing), and (ii) that Chex failed to follow reasonable procedures to assure accuracy. The first element – inaccuracy – is a binary, objective fact determined by comparing Chex's report to the bankruptcy discharge record. Ex. 6, p. 8-9. [redacted] Ex. 7, ¶¶ 40, 83-90, 96-100, 214-220. The second element – unreasonable procedures – will be established (or refuted) by generalized proof about Chex's uniform conduct; it does not depend on any class member's individual actions or knowledge. Crucially, because Plaintiff is not seeking actual damages for each class member, there is no need for individualized inquiries into each consumer's consequential harm or emotional distress. Statutory damages under the FCRA are awarded in a uniform range (up to $1,000 per class member for a willful violation, 15 U.S.C. § 1681n(a)(1)(A)), and punitive damages, if warranted, are based on Chex's conduct as a whole. Thus, the damages issues can also be handled on a classwide basis. In short, every aspect of liability and statutory damages will be resolved using evidence common to the class. Any hypothetical individual issues pale in comparison. Even if one could dream up some minor individual variations (for instance, if ChexSystems were to argue that

a particular furnisher updated one person's record in a unique way), those would be simple, straightforward, and objective determinations that do not defeat predominance. This case is the *epitome* of a Rule 23(b)(3) class action – common questions present a significant aspect of the case and can be resolved for all members in a single adjudication. *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006).

**2. The class-action device is the superior method of adjudicating these controversies.**

Finally, the Court must determine whether a class action be superior to other methods for the fair and efficient adjudication of the controversy under Rule 23(b)(3). *Lienhart*, 255 F.3d at 142; *In re A.H. Robins Co., Inc.*, 880 F.2d 709, 713 (4th Cir. 1989). The factors to be considered in determining the superiority for the class mechanism are: (1) the interest in controlling individual prosecutions; (2) the existence of other related litigation; (3) the desirability of concentrating the litigation in the forum; and (4) manageability. *Hewlett v. Premier Salons Int'l, Inc.*, 185 F.R.D. 211, 220 (D. Md. 1997); *Newsome v. Up-To-Date Laundry, Inc.*, 219 F.R.D. 356, 365 (D. Md. 2004).

In examining these factors, it is proper for a court to consider the "inability of the poor or uninformed to enforce their rights, and the improbability that large numbers of class members would possess the initiative to litigate individually." *CitiFinancial v. Logan Furniture Mart, Inc.*, 503 F.2d 1161, 1164 (7th Cir. 1974). "Class actions are particularly appropriate where multiple lawsuits would not be justified because of the small amount of money sought by the individual plaintiffs." *See Advisory Committee Note* to 1996 Amendment to Rule 23.

Class litigation is not only the most efficient means of adjudicating these disputes; it is the only means. Separately litigating the common issues that bind the two classes, whether in hundreds or hundreds of thousands of individual lawsuits would be a practical impossibility—even assuming

it were economically feasible for consumers to pursue these claims on their own. Furthermore, even if just a small fraction of the Class were to bring individual suits, the adjudication of common issues in a single proceeding would be infinitely more efficient than would be the separate adjudication of thousands of individual claims. This Court recognized as much in *Soutter*, quoting the Fourth Circuit's *Stillmock* holding:

> [The Defendant's] argument is without merit. First, the low amount of statutory damages available means no big punitive damages award on the horizon, thus making an individual action unattractive from a plaintiff's perspective. Second, there is no reasoned basis to conclude that the fact that an individual plaintiff can recover attorney's fees in addition to statutory damages of up to $1,000 will result in enforcement of FCRA by individual actions of a scale comparable to the potential enforcement by way of class action.

*Soutter*, 307 F.R.D. at 218 (citing *Stillmock*, 385 F. App'x at 274) (alteration in original).

The reality, however, is that the alternative to class treatment in these cases is not hundreds of thousands, or even hundreds, of individual actions. "As courts have repeatedly recognized, the statutory damages available under the FCRA are 'too slight to support individual suits.'" *White v. E-Loan, Inc.*, No. C05-02080SI, 2006 WL 2411420, at *9 (N.D. Cal. Aug. 18, 2006); *see also In re Farmers Ins. Co., Inc., FCRA Litig.*, No. CIV-03-158-F, 2006 WL 1042450, at *11 (W.D. Okla. Apr. 13, 2006); *Braxton v. Farmer's Ins. Grp.*, 209 F.R.D. 654, 662 (N.D. Ala. 2002) *aff'd sub nom. Braxton v. Fire Ins. Exch.*, 91 F. App'x 656 (11th Cir. 2003). Moreover, even if that were not the case, the large majority of class members would never think to bring individual claims because they are unaware their rights have been violated—having little lay knowledge of the complex blanket of FCRA protections. *See, e.g.*, *Bonner v. Team Toyota LLC*, No. 2:06-cv-157PPS, 2006 WL 3392942, at *5 (N.D. Ind. Nov. 21, 2006) ("[M]any of the persons in these classes may be unaware that the form letter sent by Defendants may violate the FCRA, and a class action suit may help to safeguard their rights."); *White v. Imperial Adjustment Corp.*, No. CIV.A. 99-3804, 2002

WL 1809084, at *14–15 (E.D. La. Aug. 6, 2002), *aff'd in part, appeal dismissed in part & remanded*, 75 F. App'x 972 (5th Cir. 2003).

"[T]here is a strong presumption in favor of a finding of superiority" where, as here, "the alternative to a class action is likely to be no action at all for the majority of class members." *Cavin*, 236 F.R.D. at 396.[5] This presumption is rooted in the policy that lies "at the very core of the class action mechanism"—namely, "overcom[ing] the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem*, 521 U.S. at 625. Thus, as Judge Easterbrook noted in *Murray v. GMAC Mortgage*, "Rule 23(b)(3) was designed for situations such as [those involving FCRA statutory damage claims for impermissible use], in which the potential recovery is too slight to support individual suits, but injury is substantial in the aggregate." 434 F.3d at 953; *see also Bonner*, 2006 WL 3392942, at *5.

Given the commonality that characterizes all of the issues in these cases, such treatment will not raise any significant manageability hurdles. Even if it did, however, "[a] class action has to be unwieldy indeed before it can be pronounced an inferior alternative—no matter how massive the . . . wrongdoing that will go unpunished if class treatment is denied—to no litigation at all." *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004). There simply is no other practical means for this Class to challenge a practice that stands in clear violation of federal law. "The desirability of providing recourse for the injured consumer who would otherwise be

---

[5] The minute fraction of consumers who theoretically might bring individual claims were this action not certified for class treatment can hardly assert any substantial interest in controlling the prosecution of their claims. Such individual control "matters mainly when absent class members have personal injury claims." *White*, 2002 WL 1809084, at *14. "Where as here, the focus of the proceeding will be the alleged course of conduct of the defendants in conscious disregard of the consumers' rights, the purpose of which is to determine whether statutory and punitive damages are due, the interest in personally controlling the litigation is small." *Id.* To the extent any individual does wish to retain such control, he or she can always opt out of the Class.

financially incapable of bringing suit and the deterrent value of class litigation clearly render the class action a viable and important mechanism in challenging fraud on the public." 6 H. NEWBERG AND A. CONTE, NEWBERG ON CLASS ACTIONS § 21:30 (4th ed. 2003).

Alternatively, in the unlikely event that Class members become aware of their rights and are able to locate counsel, this would result in a multiplicity of scattered suits resulting in the inefficient administration of litigation. The remarks of one district court faced with common issues of similar import are no less applicable here: "[t]here can be no serious dispute that . . . that considerations of judicial economy heavily favor litigating these common issues once, as part of a single class action, rather than rehashing the same questions of law and fact in each of what could likely amount to [hundreds of] thousands of individual lawsuits." *In re Napster, Inc. Copyright Litig.*, No. C 04-1671 MHP, 2005 WL 1287611, at *7 (N.D. Cal. June 1, 2005). This Court should reach the same conclusion.

## IV. CONCLUSION

ChexSystems subjected Plaintiff and thousands of other consumers to the same unlawful practice – inaccurately reporting discharged debts because of its uniform refusal to implement reasonable procedures. The class claims turn on Defendant's common course of conduct and present common legal questions that can be resolved efficiently in one proceeding. Plaintiff has shown that all prerequisites of Rule 23 are met. Accordingly, Plaintiff respectfully requests that the Court: (1) certify the proposed class (and Virginia subclass) as defined herein; (2) appoint Sharon K. Riddick as Class Representative; and (3) appoint Plaintiff's undersigned counsel as Class Counsel. Class certification will ensure that ChexSystems' systemic FCRA violations are addressed on a classwide basis, and that all affected consumers – not just the named Plaintiff –

have their day in Court. For these reasons, Plaintiff's Motion for Class Certification should be granted and the Class defined above should be certified.

Respectfully submitted,

**SHARON K. RIDDICK,** ***individually and on behalf of all others similarly situated,***

By: *<u>/s/ Leonard A. Bennett</u>*

Leonard A. Bennett, VSB #37523
Mark C. Leffer, VSB# 40712
Craig C. Marchiando VSB #89736
**Consumer Litigation Associates, P.C.**
763 J. Clyde Morris Blvd., Suite 1-A Newport News, VA 23601
Telephone: (757) 930-3660
Fax: (757) 930-3662
Email: lenbennett@clalegal.com
Email: mark@clalegal.com
Email: craig@clalegal.com

Drew David Sarrett, VSB #81658
Emily Connor Kennedy, VSB # 83889
Consumer Litigation Associates, PC
626 East Broad Street, Suite 300
Richmond, VA 23219
Telephone: 804-905-9900
Fax: 757-930-3662
Email: drew@clalegal.com
Email: emily@clalegal.com

***Counsel for Plaintiff***