**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**SHARON K. RIDDICK,**
**on behalf of herself and all others similarly situated,**

**Plaintiff,**
**v.** **Case No. 2:24-cv-00700- EWH-RJK**
**CHEX SYSTEMS, INC.,**
**Defendant.**

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

Plaintiff Sharon K. Riddick ("Plaintiff" or "Ms. Riddick"), by Counsel, respectfully submits this Reply in support of her Motion for Class Certification of Claims against Defendant Chex Systems, Inc. ("ChexSystems" or "Defendant") (ECF No. 96).

## I. PRELIMINARY STATEMENT

The central issue in this case is straightforward: ChexSystems has a uniform, companywide policy of doing nothing to verify whether debts appearing in its QualiFile reports have been discharged in bankruptcy. Its own President admitted this. Its own cited witnesses confirmed it. It is undisputed. That uniform failure—applicable identically to every putative class member—is the engine of this class action. Whether ChexSystems' blanket refusal to implement any bankruptcy verification procedure violates FCRA § 1681e(b)'s "reasonable procedures" mandate is a single, common question that will resolve liability for the entire class in one proceeding. That is the textbook definition of a class action. The Court should grant class certification.

## II. LIMITED REPLY AS TO DEFENDANT'S FACTS[1]

[1] ChexSystems attempts to place Plaintiff in the difficult position of fully litigating the merits evidence of the case in this Rule 23 posture in a Reply brief. This is not merely a procedural complaint. Much of the "evidence" Defendant proffers in its opposition is grossly misleading at best and patently false at worst. Defendant's 59-page opposition (Def. Opp., ECF 110)("Opp.") is thus difficult to answer. It ignores almost entirely the arguments, facts and law detailed in Plaintiff's opening. It abandons not only that structure, but as well the ordinary sequence structure of Fed. R. Civ. P. 23(a) and 23(b)(3). It devotes more than half of its page range to merits arguments it concedes in introduction "[t]he Court need not decide ... now." (Def. Opp., ECF 110 at 2)("Opp.").

ChexSystems' statement of facts is less a response to Plaintiff's opening than a freestanding attempt to litigate the merits. Much of it is misleading or incorrect, but at this posture the Court need not resolve those disputes. The controlling legal standard is clear: Rule 23 "grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013); *see also Williams v. Big Picture Loans, LLC*, 339 F.R.D. 46, 61 (E.D. Va. 2021), *aff'd sub nom. Williams v. Martorello*, 59 F.4th 68 (4th Cir. 2023). Moreover, Rule 23(b)(3) "requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Williams v. Martorello*, 59 F.4th at 91 (quoting *Amgen*, 568 U.S. at 459). This Court "will inquire no further into the merits than is necessary to determine the likely contours of [an] action should it proceed on a representative basis." *Midkiff v. Anthem Companies, Inc.*, 748 F. Supp. 3d 376, 384 (E.D. Va. 2024). Several matters from ChexSystems' factual recitation warrant direct reply under that standard. Still, Plaintiff cannot let so many of these misstatements sit.

**A. ChexSystem's Violation of § 1681e(b) is Uncontroversial.**

ChexSystems' assertion that there is some weight of law supporting its defense is plainly wrong. As this Court already found, the question of whether a consumer reporting agencies are reasonable will remain a question of fact, and Defendant's repeated boast of having one case in a Kansas District Court a decade ago does not change that. ChexSystems recycles its argument—rejected at the motion to dismiss stage—that a single out-of-circuit district court decision, *George v. ChexSystems*, 2017 WL 119590 (D. Kan. Jan. 12, 2017), immunizes its practices. This Court has already declined to hold that *George* controls here. (ECF No. 54, n.3.) The argument fares no

better now. Moreover, ChexSystems' own President testified at deposition that he was not even aware of what *George* held, and that the decision did not result in any change to ChexSystems' policies or procedures. (ECF 135 at 7-11). Most significantly, *George* did not address whether ChexSystems' procedures were "reasonable" in any meaningful sense—that question was not before the *George* court, and ChexSystems cannot derive a blanket immunity from a ruling that did not engage in the reasonable procedures analysis that § 1681e(b) requires.

Similarly, not only did the Federal Trade Commission never conclude as Defendant asserts, but in fact it has expressly held the opposite – in the FTC 40 Years of FCRA report in which its then-FTC, now revolving door attorney expert Kuehn actively stated the opposite. Other than odd outliers, over its now 55-year history, regulators and courts have understood this requirement to be such that, "If the ... CRA should reasonably be aware of steps it can take to improve the accuracy of its reports at a reasonable cost, it must take any such steps." Fed. Trade Comm'n, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT, at 67 (July 2011). ChexSystems also knows that the established regulatory law required that, "A consumer report may include an account that was discharged in bankruptcy" only as long as it also "reports a zero balance to reflect the fact that the consumer is no longer liable for the discharged debt," and that, "It is not a reasonable procedure to label an account that has been discharged in bankruptcy as 'charged off as bad debt' if the account was open and not charged off when the consumer filed bankruptcy." Fed. Trade Comm'n at 68. And unlike the facts as to Equifax in *Rydholm v. Equifax Info. Servs. LLC*, here the CRA defendant is not accused of doing an insufficient job of processing and sorting its bankruptcy records, but rather of deliberate blindness such that it neither seeks out nor even investigates the reasonable availability of such records. Its employees in charge of such

decisions have confirmed. Judge Walker rejected these legal arguments after reading them in their full bloom on the merits.

**B. Chartway Received and Understood the Inaccurate ChexSystems report.**

Plaintiff has not sought actual damages and while she may have had a chance to do so, she will establish that Defendant's FCRA violation was willful and recover statutory and punitive damages. 15 U.S.C. § 1681n. Still Defendant wants to argue about whether its report was the primary cause of Ms. Riddick's inability to open a Chartway bank account.[2] ChexSystems claims that its two QualiFile reports recommended Chartway "ACCEPT" Plaintiff and that Chartway "never denied Plaintiff an account." This directly contradicts Plaintiff's sworn testimony based on her personal knowledge and experience, rather than a recreation by a records custodian allied with Defendant. It also contradicts Ms. Riddick's own account of being told by Chartway that the denial was based on the derogatory ChexSystems entry. Specifically, when ChexSystems deposed Ms. Riddick, she freely described her experience under questioning by ChexSystems' counsel:

> Q: Well, what is your recollection of what she [Chartway representative Ms. Poe] told you?
> A: That they could not open the — an account for me and that was the reason why.
> Q: What was the reason why?
> A: Because of the financial in -- that I still owed money to a financial institution that was being reported to them by Chex Systems.

(Riddick Dep. 116:1-8, Ex. 1.) Contrary to Defendant's assertions, Plaintiff testified that Chartway refused to open an account for her on two occasions because of the SunTrust account reflected in her ChexSystems report, (Riddick Dep. 116:1-8, Ex. 1; Pl.'s Obj. and Ans. to ChexSystems' First Set of Interrog., No. 4, Ex 2.). Ms. Riddick did not "just sue" but instead, after being turned away by Chartway Federal Credit Union, she first called Suntrust (Riddick Dep. 124:25-125:3, Ex. 1),

[2] Chartway is also only one of the third-parties that received ChexSystem's reporting of the defamatory account. Defendant's records also confirm it was sold to others, including TransUnion.

then attempted to both call ChexSystems and access its online dispute system. (Riddick Dep. 123:13-124:24, Ex. 1.) Unfortunately, was unable to speak with anyone at ChexSystems because its phone system is fully automated (Riddick Dep. 123:24-124:6, Ex. 1), and she was unsuccessful in accessing its online dispute system because her attempt "timed out" (Riddick Dep. 125:4-23, Ex. 1).

Defendant proffers a declaration from a Chartway employee years after the fact; the declaration was procured by Defendant's own counsel on the eve of the class certification deadline. Plaintiff disputes its accuracy. Regardless, ChexSystems' own evidence and declarations confirm that financial institution customers select their own decisioning strategies and that ChexSystems includes a recommendation in its reports based on those strategies.

And regardless – this is also irrelevant even at merits as it goes to the question of actual damages rather than standing.

**C. Plaintiff's Debt was Discharged before it was Reported.**

Defendant's recitation of other Plaintiff-specific "facts" is similarly irrelevant to the issues presented by class certification and serves only to distract from the central question in this case: whether ChexSystems reported inaccurate information about a debt that had been discharged in bankruptcy. Whether Ms. Riddick previously filed other bankruptcies, how she completed her bankruptcy schedules, or whether the amount listed precisely matched SunTrust's records has no bearing on whether the debt at issue was discharged under 11 U.S.C. § 727(b), which discharges all pre-petition debts regardless of subsequent account activity. The central fact is that Ms. Riddick clearly discharged the debt she owed to Suntrust in her 2017 bankruptcy case. Section 727(b) of the Bankruptcy Code provides that a Chapter 7 discharge applies broadly to all prepetition debts except those specifically excepted under § 523(a). When Ms. Riddick converted her case from

Chapter 13 to Chapter 7 on June 17, 2019, she stated under penalty of perjury that she owed at that time a debt to SunTrust "incurred after commencement of the original bankruptcy case" on an "over-drawn account" in the amount of $421.66. (Riddick_Plaintiff_000010, Ex. 3). Bankruptcy Code § 348(d), applying specifically to conversion of a case from Chapter 13 to Chapter 7, states that debts incurred between the initial bankruptcy case filing date and the conversion date "shall be treated for all purposes as if such claim had arisen immediately before the date of the filing of the petition." 11 U.S.C. § 348(d). No record of reaffirmation or of any order denying the dischargeability of this Suntrust debt exists. Accordingly, the SunTrust debt was a debt subject to the discharge order under 11 U.S.C. § 727(b). Moreover, there is no evidence that any purported ambiguities in the Schedules (e.g., the amount of the debt stated as $421.66) affected SunTrust's reporting or that SunTrust lacked notice of the bankruptcy.

**D. Defendant Does Not Have ANY Procedures to Monitor or Sanction.**

The Court needs to carefully read Defendant's language. Its claim that its furnishers have an obligation to update their tradelines is materially qualified – they must do so only if the consumer communicates the discharge to the furnisher. Husaby Dep. 39:7–25, 50:1-8, Ex. 4 (Confirming that "Chex Systems' contribution policy does not place an obligation on the bank or the furnisher to affirmatively determine whether something has been discharged in bankruptcy".); Whyte Dep. 47:10–48:5, Ex. 5 ("[I]s there any obligation in accordance with your contribution policies for the furnisher to go and seek out bankruptcy information affirmatively as opposed to waiting for someone to present it with it? A: My policy -- I cannot -- no. So the short answer is no. I do not have influence over my clients' policies.")

ChexSystems' own witnesses confirmed at deposition that none of its metrics track accuracy with respect to bankruptcy-discharged debts. Whyte, ChexSystems' President, testified

that ChexSystems operates two monitoring programs—a Transaction Verification Audit ("TVA") and a Dispute Monitoring Request ("DMR") program—and described the KPIs those programs track: "We monitor our clients with certain KPIs around velocity of disputes, velocity of corrections, non-responses." Whyte Dep. 29:4–6, Ex. 5. He further testified that the TVA tracks data "anomalies" such as fake names, training inquiries, and testing data—not whether furnishers are correctly withdrawing bankruptcy-discharged events. When asked directly whether the TVA checks for correct bankruptcy withdrawals, Whyte testified that Defendant's "credentialing process … is more designed for ensuring that they continue to use the services under permissible purpose and the information that they're sending us is legit." Whyte Dep. 44:15–25; 45:1–3, Ex. 5. Whyte also confirmed that the DMR program does not include any accuracy metrics calibrated to detect whether furnishers are incorrectly retaining bankruptcy-discharged closures. Whyte Dep. 35:1–6, Ex. 5. None of these metrics measure whether the *reason* for a deletion or non-deletion corresponds to a bankruptcy discharge.

When asked whether ChexSystems had conducted any systematic study, audit, or analysis to determine whether there is any connection between disputes received about closures and actually incorrectly reported closures, Husaby testified that she had not conducted—and was not aware of anyone at ChexSystems or FIS who had conducted—any research into procedures or data that would allow ChexSystems to independently and affirmatively determine whether a consumer has obtained a bankruptcy discharge. Husaby Dep. 82:1–4, Ex. 4. Whyte confirmed. Whyte Dep. 49:10–25, Ex. 5. He also confirmed that ChexSystems has had no procedure in place—other than trusting furnishers to self-correct—to obtain bankruptcy discharge information. Whyte Dep. 50:1–8, Ex. 5. Similarly, Husaby confirmed Defendant was unaware of what percentage of discharged closures are ever affirmatively removed by furnishers after discharge. Husaby Dep. 45:22, Ex. 4.

And when asked how many of ChexSystems' contributing furnishers have systems in place to affirmatively seek out and become aware of a consumer's bankruptcy discharge, she answered: "I don't know." Husaby Dep. 43:22, Ex. 4.

The practical consequence of this monitoring gap is equally damning. Whyte confirmed that, to his knowledge, ChexSystems has never met with, threatened to suspend, or actually stopped accepting events from any customer because they failed to withdraw events that had been discharged in bankruptcy. Whyte Dep. 61:21–62:1, Ex. 5. Defendant's president could not name any furnisher that had been suspended under the DMR process at all. Whyte Dep. 30:1–32:11, Ex. 5.

**E. ChexSystems Made a Deliberate Choice to Ignore Available Bankruptcy Data**.

The record also establishes that ChexSystems' failure to cross-reference bankruptcy discharge information is not a gap it was unaware of—it is a deliberate choice. Whyte confirmed that ChexSystems currently receives bankruptcy information from LexisNexis and simply chooses not to use it: "We receive that information from LexisNexis today. And we just don't look at it—as well as any other negative public record data we don't look at." Whyte Dep. 68:3–5, Ex. 5. When asked directly whether the choice not to incorporate that data was ChexSystems' own: "Q: And that's—that's what you have chosen to do? A: That's what we have chosen to do. Yeah." Whyte Dep. 68:8–9, Ex. 5. He further confirmed that since at least 2015, ChexSystems has never researched the feasibility of using PACER or alternative bankruptcy notification services to improve the accuracy of its QualiFile reports with respect to discharge status. Whyte Dep. 66:8–17, Ex. 5.

The disputed facts ChexSystems presses are not germane to class certification, and the Court should not resolve them at this stage.

## III. ARGUMENT

ChexSystems' Opposition confirms that certain Rule 23 prerequisites are simply not in dispute. ChexSystems does not contest that the proposed class satisfies Rule 23(a) Numerosity, Commonality[3] and Adequacy[4] or Rule 23(b)(3)'s Superiority requirement. Its silence on those elements is, for purposes of this Reply, a concession that they are met. The Opposition confines itself to four contested grounds: typicality under Rule 23(a)(3) and (a)(4); commonality under Rule 23(a)(2); predominance under Rule 23(b)(3); and ascertainability as an implied Rule 23 requirement. Each contested ground—and each argument ChexSystems raises within it—is addressed in turn in this Reply. For the Court's convenience, the arguments ChexSystems raises under their correct element.[5]

### A. PLAINTIFF SATISFIES RULE 23(a)(3) - TYPICALITY

To establish typicality, a plaintiff must show that her claims arise from the same course of conduct as those of the class and rest on the same legal theories. *Ealy v. Pinkerton Gov't Servs., Inc.*, 514 F. App'x 299, 305 (4th Cir. 2013). "Minor differences in the underlying facts of individual class members' cases do not defeat a showing of typicality where there are common questions of law." *Soutter*, 307 F.R.D. at 205. The test is not whether Plaintiff's facts are identical to every class

---

[3] As addressed below, ChexSystems mislabels its predominance arguments as commonality. Commonality is related, but distinct in that a movant can satisfy Rule 23(a)(2) merely by establishing that "there are questions of law or fact common to the class." A single common issue meets this element. *Gray v. Hearst Commc'ns, Inc.*, 444 F. App'x 698, 700–01 (4th Cir. 2011). Defendant leaves unanswered Plaintiff's commonality arguments and issues. (Opening at 14-16). What it is actually arguing is predominance – the Court's obligation to weight the burden of litigating individual issues against the efficiencies of litigating core common issues. As this Court has put it, "[i]f the 'qualitatively overarching issue' in the litigation is common, a class may be certified notwithstanding the need to resolve individualized issues." *Soutter*, 307 F.R.D. at 214.

[4] As addressed below, the argument ChexSystems labels as "Adequacy" is actually just a typicality argument, which Plaintiff addresses accordingly.

member's; it is whether her claim arises from the same course of conduct and presents the same legal theory.

Ms. Riddick's claim, like every class member's, is simple: ChexSystems reported a debt on her QualiFile report that had been discharged in bankruptcy, and it did so because it had no procedure to check. That is the identical claim every class member brings. ChexSystems' uniform failure to implement any bankruptcy verification procedure is what generates both Plaintiff's claim and the class claims. Typicality is satisfied.

**1. ChexSystems' Argument That Plaintiff Is Not a Class Member is Incorrect**

ChexSystems' primary typicality argument is that Plaintiff does not fit the class definition because the date in its records for her SunTrust account closure—July 12, 2019—post-dates her Chapter 7 conversion on June 17, 2019. From this, it argues that the reported account did not pre-date the bankruptcy filing and therefore was not dischargeable.

This argument is legally and factually wrong. As to the law: in cases converted from Chapter 13 to Chapter 7, the petition date for discharge purposes is the original Chapter 13 filing date—here, July 24, 2017. *See* 11 U.S.C. § 348(a). This is a debated legal question that ChexSystems cannot simply declare resolved in its favor on a class certification motion. Ms. Riddick's SunTrust account—an overdraft on a checking account that had been open for years—plainly arose before she converted to Chapter 7 in June 2019. The closure in July 2019 was SunTrust charging off and reporting an account that pre-existed the conversion. As a matter of bankruptcy law, the relevant inquiry is when the underlying debt arose, not when the creditor closed the account.

ChexSystems also misunderstands the mechanics of bank account charge-offs. A charge-off typically occurs six months after account delinquency. SunTrust's report of a July 12, 2019

closure date is therefore consistent with a delinquency that arose well before Ms. Riddick's June 2019 Chapter 7 conversion. ChexSystems retains only the date it received the closure report from SunTrust, not the date the underlying obligation arose. That limitation is a product of ChexSystems' own inadequate record-keeping, not evidence that the debt was post-petition.

Even accepting ChexSystems' framing, its argument is that because of facts specific to the way it records data about Plaintiff, her claim may or may not fall within the class definition as currently written. That is resolved by ensuring the class definition is sufficiently broad or by a minor refinement—not by denying certification. As addressed below, Rule 23 requires the Court to adapt and refine a class definition to fit the facts that arise on certification. The Court possesses authority to modify the class definition to ensure it captures persons in Plaintiff's position and should exercise that authority rather than deny certification entirely.

**2. The Proposed "Scrub" Is a Red Herring Not Material at this Posture**

ChexSystems argues that even if it had scrubbed its records against PACER, the scrub would not have identified Plaintiff's account because the closure date post-dates her Chapter 7 conversion. This is also contested and wrong. A properly designed scrub—matching the debt's origination date or the account's creation date against the bankruptcy filing date, rather than merely matching the date ChexSystems received the furnisher's report—would have identified that the account originated well before the bankruptcy. What procedure ChexSystems follows should be tailored for the range of inaccuracy concerns – including the date reported versus date debt was incurred question Defendant asks itself. But that broad and complete process to ensure maximum possible accuracy is exactly the kind of procedure that ChexSystems refuses to implement. Regardless, this is not a Rule 23 question, but rather merits objections Defendant may assert to specific examples of more reasonable procedures Plaintiff may advocate at trial.

The argument that Plaintiff's scrub "would have made no difference" assumes facts about how a scrub would be designed where no scrub is being debated. The question here as to typicality is whether Defendant failed to follow procedures reasonable to ensure maximum possible accuracy. 15 U.S.C. § 1681e(b). Plaintiff will at trial proffer multiple procedures Defendant could have considered and followed in addition to its reliance on self-reporting by consumers. that are in dispute, and in any event assumes ChexSystems' own inadequate record-keeping is the relevant reference point rather than what a reasonable CRA's records would contain. Moreover, a scrub does not need to be fully automated or limited to a single source to improve accuracy. A scrub that identifies a potential bankruptcy match could flag an account for manual review. ChexSystems chose not to implement any such process—not because it was impractical, but because it made no effort to investigate whether one was available or feasible. Plaintiff need not identify a perfect alternative procedure; the FCRA requires only "maximum possible accuracy," not perfection, and the question of whether ChexSystems' complete inaction satisfies that standard is a classwide merits question.

**3. There Is Ample Evidence That Furnisher Reliability Determinations Present a Common Rather Than Individualized Question**

ChexSystems argues that Plaintiff's theory requires her to demonstrate that SunTrust specifically was an unreliable furnisher, yet she has no such evidence. The furnisher reliability question is addressed in full *supra*, where Plaintiff demonstrates that ChexSystems' "furnisher reliability" argument is factually unsupported

This argument also conflates the typicality inquiry with the merits and misframes the nature of Plaintiff's claim. Plaintiff does not need to prove at class certification that SunTrust failed to accurately report—her claim is that ChexSystems had no procedure whatsoever to verify whether

any reported debt, from any furnisher, had been discharged in bankruptcy. That zero-procedure policy applies uniformly to every class member regardless of which furnisher reported their account. The question of whether that uniform policy was reasonable is a common one.

Further, the Defendant's overreliance on the statistical results offered by Plaintiff's expert witness is strange as it clearly understands and was part of the negotiation to produce data samples that were solely for the purpose of showing a class could be identified and that it was numerous. After certification, the Court and jury will benefit from an accurate statistical analysis as to the degree of inaccuracy when Defendant becomes obligated by its negotiated compromise to produce the full class data set.

**4. ChexSystems' Standing and Injury Arguments Misread the Law**

ChexSystems argues that Plaintiff lacks standing because ChexSystems' reports recommended Chartway "ACCEPT" her and Chartway never denied her account. Plaintiff vigorously disputes these facts. She has alleged under oath that she was denied, and has produced complaint-level evidence that Chartway told her the denial was based on the ChexSystems entry. ChexSystems' post-hoc Chartway declaration—procured by Defendant's own counsel on the eve of the class certification deadline—is itself disputed evidence. At class certification, disputed factual questions about standing go to the merits and should not be resolved in the defendant's favor.

Still, the defense argument *du jour* is Article III standing. Every FCRA defendant feels compelled to argue it on class certification. As to the claim under §1681e(b), Plaintiff and every other class member has standing because each report was materially inaccurate and furnished to a third party. The Supreme Court expressly held such. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 433, 141 S. Ct. 2190, 2209, 210 L. Ed. 2d 568 (2021) ("TransUnion points out that the reports

merely identified a consumer as a "*potential* match" to an individual on the OFAC list—a fact that TransUnion says is not technically false. … The harm from being labeled a "potential terrorist" bears a close relationship to the harm from being labeled a "terrorist." In other words, the harm from a misleading statement of this kind bears a sufficiently close relationship to the harm from a false and defamatory statement. In short, the 1,853 class members whose reports were disseminated to third parties suffered a concrete injury in fact under Article III."); *see also Chuluunbat v. Experian Info. Sols., Inc*., 4 F.4th 562, 567, n.3 (7th Cir. 2021). Critically, Defendant never previously raised this standing argument—not in discovery and not in its Rule 12 briefing. Defendant appears to be confusing the concepts of actual damages and causation with Article III standing.

The Supreme Court in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), confirmed that the publication of a materially inaccurate consumer report to a third party is itself a concrete harm sufficient for Article III standing—without any requirement of showing that the third party actually took adverse action. The Fourth Circuit has affirmed the same principle. In *Fernandez v. RentGrow, Inc.*, 116 F.4th 288, 295–96 (4th Cir. 2024), the Court of Appeals considered the question of whether the "published to a third party" element is satisfied where the inaccurate report was never practically communicated - that is where the third party could not decipher or understand the publication. The Court of Appeals explained its understanding of *Ramirez:*

> The Supreme Court has applied these principles to the statutory harm asserted here: failure to "follow reasonable procedures to assure maximum possible accuracy" of the OFAC information in a plaintiff's credit file. 15 U.S.C. § 1681e(b). In *TransUnion*, the Supreme Court held that "publication to a third party of a credit report bearing a misleading OFAC alert" concretely injures the subject of the report. 141 S. Ct. at 2208. That injury bears a close relationship to "the reputational harm associated with the tort of defamation," which is a harm traditionally recognized as providing a basis for a lawsuit in American courts. *Id.*
> …

> Importantly, the Supreme Court emphasized that the presence of the same misleading OFAC alert "in an internal credit file" causes "no concrete harm" if "it is not disclosed to a third party." *Id.* at 2210. … Accordingly, the Court held that the class members whose misleading credit reports were provided to third-party businesses suffered a concrete harm and thus had standing to pursue their FCRA reasonable-procedures claim, but the class members whose misleading internal credit files were *not* provided to third-party businesses did not suffer a concrete harm and thus did not have standing to pursue their claim. *See id.* at 2200.

*Fernandez,* 116 F.4th at 295–96. The consumer still lost because the third-party rental agent "testified that she did not know if she had ever looked at the section of a screening report about OFAC potential matches. Indeed, Kemp—the senior property manager for Dorsey Ridge—admitted she was not even "sure what OFAC is." Id. at 299.

By that read alone – the consumer has standing under § 1681e(b) so long as the inaccuracy is published to a third party absent evidence that the third-party did not actually read or understand the inaccurate item. Under that read – the Fourth Circuit's - Ms. Riddick has standing. She has testified as to direct evidence from the Chartway employees handling the actual applications that her denials was impacted by the ChexSystems report. Whoever has heard of ChexSystems outside FCRA litigants and bankers? How else would she have known to contact Defendant to request her report? As she confirmed under oath, she learned of ChexSystems when told that her derogatory report had impacted her application.

But even if it had not – even if Chartway read the report and discounted it given the separate "Accept" score, that only goes to the question of causation for actual damages. Every court known to likely both sides has found that reporting of a major derogatory chargeoff debt is defamatory under § 1681e(b). And the Fourth Circuit itself addressed and rejected Defendant's attempt here to merge damages and proof of denial with evidence of the minimal burden of constitutionally sufficient injury:

> That is not to say that a plaintiff need show any *additional* or *tangible* harm once a third party has read the misleading information and understood its defamatory significance. … That reputational injury is sufficiently concrete to support Article III standing, even though a given cause of action may require more to state a claim. *Cf. Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 922 (4th Cir. 2022) ("[O]ur inquiry 'focuse[s] on types of harms protected at common law, not the precise point at which those harms become actionable.' " (quoting *Krakauer v. Dish Network, LLC*, 925 F.3d 643, 654 (4th Cir. 2019))).

*Fernandez,* 116 F.4th at 297. Thus, even assuming for the sake of argument that ChexSystems' version of the Chartway events is correct, Plaintiff's injury is not limited to the denial itself. The dissemination of an inaccurate consumer report—particularly one stating that a consumer owes a debt she no longer owes—is itself a concrete harm.

## B. PLAINTIFF SATISFIES RULE 23(b)(3) - PREDOMINANCE

### 1. The Common Question Overwhelms Any Individual Issues

As an initial matter, Defendant conflates Rule 23(a) commonality with Rule 23(b)(3) predominance. These are distinct inquiries. Commonality under Rule 23(a) asks only whether the class's claims share "even a single" common question of law or fact whose answer will "resolve an issue that is central to the validity of each one of the claims." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Predominance under Rule 23(b)(3) asks whether those common questions predominate over any individual ones. Defendant's brief largely ignores the entire commonality showing in Plaintiff's opening brief and conflates what is actually a manageability argument with a predominance argument. Individual questions about class member identification are not "predominance" problems; they are manageability questions, and this Court has repeatedly held that the need for some administrative review does not defeat certification. *Soutter*, 307 F.R.D. at 196-97.

ChexSystems offers several "individualized issues" it contends defeat predominance. But it entirely ignores the common questions Plaintiff identified in her opening, and it fundamentally misidentifies what the "overriding" question in this litigation is.

The qualitatively overarching issue in this case is whether ChexSystems' blanket refusal to implement any procedure to verify whether reported accounts have been discharged in bankruptcy—despite the ready availability of such data and over a decade of industry standards—constitutes a willful violation of FCRA § 1681e(b). That question is identical for every class member. It turns entirely on ChexSystems' own conduct, not on any class member's individual circumstances. As the Fourth Circuit has explained, "the qualitatively overarching issue by far" in a case like this will be "the liability issue of the defendant's willfulness, and the purported class members were exposed to the same risk of harm every time the defendant violated the statute in the identical manner." *Stillmock*, 385 F. App'x at 273.

Common questions here include at minimum: (a) whether ChexSystems is subject to § 1681e(b)'s requirements with respect to the class of reports at issue; (b) whether ChexSystems had any procedure to verify whether reported account closures had been discharged in bankruptcy; (c) whether ChexSystems' uniform absence of such a procedure violates § 1681e(b)'s "reasonable procedures" mandate; and (d) whether that violation was willful within the meaning of 15 U.S.C. § 1681n. These questions will yield common answers applicable to every class member in one proceeding.

**2. Classwide Inaccuracy Is Susceptible to Common Proof**

ChexSystems' most significant new legal argument is that each class member's claim requires an individualized showing of "objectively and readily verifiable" inaccuracy under

*Roberts v. Carter-Young, Inc.*, 131 F.4th 241 (4th Cir. 2025). This argument fails for multiple reasons.

First, *Roberts* addressed the duty of a furnisher under § 1681s-2(b) to reinvestigate after a consumer dispute—not a CRA's duty under § 1681e(b) to maintain reasonable procedures before issuing a report. These are distinct statutory provisions with distinct purposes. Section 1681e(b) imposes on CRAs a proactive duty to "follow reasonable procedures to assure maximum possible accuracy." The "objectively and readily verifiable" gloss developed in *Mader v. Experian Info. Solutions, Inc.*, 56 F.4th 264 (2d Cir. 2023)—which Defendant now urges this Court to import wholesale—was developed in the context of contested debt validity determinations, where courts have long held that CRAs and furnishers are not expected to adjudicate legal disputes about whether a particular debt is valid. The question here is not whether any individual debt is valid; it is whether ChexSystems has any procedure whatsoever to check bankruptcy court records—a purely ministerial, administrative task that requires no legal adjudication.

Second, Defendant misreads *Roberts*' treatment of *Mader*. *Roberts* did not adopt *Mader* wholesale. To the contrary, *Roberts* expressly rejected the aspect of *Mader* that created a narrow law-versus-fact test for "inaccuracy" under the FCRA. The *Roberts* court's limited engagement with *Mader*'s reasoning was confined to the context of a furnisher's reinvestigation duty under § 1681s-2(b)—not a CRA's reasonable procedures obligation under § 1681e(b).

Third, under the "objectively and readily verifiable" standard, Plaintiff wins. The fact of a Chapter 7 bankruptcy discharge is objectively and readily verifiable: it is a matter of public record in PACER. Its date is publicly recorded. The accounts listed in bankruptcy schedules are publicly recorded. The absence of reaffirmation agreements can be checked. Mr. Cox, Plaintiff's bankruptcy expert, has detailed a process for verifying discharge that, while requiring multiple steps, is entirely

dependent on objective public records—not on the resolution of contested legal questions. The distinction *Roberts* draws is between objective, verifiable facts and contested legal conclusions about debt validity. Bankruptcy discharge is the former, not the latter.

Fourth, ChexSystems' application of *Roberts* to defeat predominance confuses two different inquiries. Even if some individual verification is required to confirm that a specific debt was discharged, the predominant common question remains whether ChexSystems had any reasonable procedure to even begin that inquiry. It had none. That uniform failure is the overarching common issue. Whatever individual inquiry might be required to confirm discharge status at the damages stage does not defeat the common liability question.

The case ChexSystems relies on to apply *Roberts* to § 1681e(b), *McFadden v. Equifax Info. Servs., LLC*, 2025 WL 3503039 (E.D. Va. Oct. 27, 2025), is a single-plaintiff case decided on a motion to dismiss—not a class certification decision. It has no bearing on whether the issues in this case are susceptible to classwide proof.

**3. Inaccuracy Is a Common Question, Not an Individualized One**

ChexSystems argues that determining whether each class member's report was inaccurate requires individualized inquiry. This argument fails. In this case, the inaccuracy alleged is not complex: ChexSystems reported a consumer's account as having an outstanding unpaid balance when, by virtue of a Chapter 7 discharge, the consumer no longer owed that debt. Reporting a discharged debt as if it were currently owed is inaccurate as a matter of law. It is "patently incorrect." *See Dalton v. Cap. Associated Indus., Inc.*, 257 F.3d 409, 415 (4th Cir. 2001). It is the class-defining inaccuracy, and it is present in every class member's report by the definition of the class itself. *Cf. Soutter*, 307 F.R.D. at 214 ("Determining inaccuracy constitutes a common question.")

ChexSystems' argument really is not about whether the class's inaccuracy is individualized—it is about whether each class member's account was actually discharged. But that is precisely the ascertainability question, not the inaccuracy question. Once a class member is identified (i.e., once it is established that their reported debt was discharged), the inaccuracy of the report follows automatically. The question of whether ChexSystems' report was inaccurate for a confirmed class member is common and binary: it was.

**4. ChexSystems' Reasonable Procedures Failure Is a Common Question**

ChexSystems' most emphatic opposition point is that whether its procedures were "reasonable" with respect to each class member requires individualized inquiry into whether each furnisher was reliable. This argument is both factually baseless and legally misguided.

ChexSystems had a uniform companywide policy—confirmed by its own witnesses—of implementing zero procedures to verify bankruptcy discharge status. This Court has already noted that Plaintiff's theory does "not rest on an argument that a [CRA] is bound in any and all circumstances to check the bankruptcy record before preparing a report." (ECF No. 54 at 5.) But Plaintiff's theory is not "any and all circumstances"—it is the specific circumstances where ChexSystems' own records contain an unpaid account closure that pre-dates a Chapter 7 bankruptcy discharge that is a matter of public record. In those circumstances, a reasonable procedure would detect the discrepancy. ChexSystems has no such procedure. That is uniform and applies to the entire class.

As this Court explained in *Soutter*, a "reasonableness" determination regarding procedures is only "individualized" if the procedures in question actually varied *by individual*. *Soutter*, 307 F.R.D. at 202 (citing *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 742 (5th Cir. 2003)). ChexSystems does not—and cannot—allege that its policy of implementing zero

bankruptcy verification procedures varied from class member to class member. It was a single, uniform, company-wide policy. The reasonableness of that policy is therefore a common question that drives the litigation for every class member in one stroke.

ChexSystems argues that it cannot be found to have unreasonable procedures unless Plaintiff shows that the specific furnisher reporting each class member's account was unreliable. This overstates the law. CRAs have an obligation under § 1681e(b) to maintain procedures adequate to ensure maximum possible accuracy. Where a CRA has access to easily available public information—bankruptcy court records—that would reveal that information it is reporting is inaccurate, the failure to check that public information can itself render procedures unreasonable, regardless of whether the individual furnisher was "reliable" in the narrow sense of accurately reporting what it knew. ChexSystems knows that Chapter 7 bankruptcies discharge debts; it knows its reports contain account closures that may pre-date bankruptcy filings; it knows public bankruptcy records are available; and it already has access to bankruptcy data that it has chosen not to use. That choice applies uniformly across the class.

ChexSystems' "furnisher reliability" defense also suffers from the same flaw this Court rejected in *Soutter*: it amounts to a "causation" argument that is "too clever by half." *Soutter*, 307 F.R.D. at 203. Just as Equifax there tried to defeat class certification by speculating that any given inaccuracy "could be attributable to another source, such as a court clerical error," ChexSystems here tries to defeat certification by arguing that the inaccuracy might be attributable to a specific furnisher rather than to ChexSystems' blanket policy of ignoring bankruptcy data. This Court held that "[m]ere conjecture about wayward scriveners does not disturb the question common to the class: whether [the CRA's] procedures were unreasonable. [The] 'causation' argument has no

bearing on whether [the CRA's] procedures were or were not unreasonable. That question is common across the class and capable of resolution on a classwide basis." *Id.* The same is true here.

The entire premise of the "furnisher reliability" argument rests on false testimony. ChexSystems' opposition represents that it "actively monitors" furnisher reliability and that its data contribution policies require furnishers to update bankruptcy-discharged accounts. But the deposition record tells a different story: ChexSystems' own witnesses confirmed that (a) the KRI metrics track no data specifically related to bankruptcy accuracy; (b) furnishers have no obligation under their contracts to affirmatively seek out or report bankruptcy discharge information; and (c) the only mechanism for updating a previously reported closed account is if the consumer first notifies the creditor of the bankruptcy. ChexSystems' "furnisher reliability" defense is a litigation construct contradicted by its own discovery testimony.

**5. Certifying a Nationwide Class Does Not Deprive ChexSystems of Jurisdictional Defenses**

ChexSystems argues that a nationwide class cannot be certified because it would be denied the benefit of the Eighth Circuit's decision in *Rydholm v. Equifax Information Services*, 44 F.4th 1105 (8th Cir. 2022), which it claims provides a complete defense in jurisdictions within that circuit. This argument does not support denial of certification. As Plaintiff addresses in Section VII (Superiority) below, the FCRA is a federal statute with uniform national requirements. The question of whether ChexSystems' procedures violated that statute is governed by the same federal standard in every jurisdiction. ChexSystems cannot use its preference for a particular circuit's view to deny thousands of class members their day in court on a federal claim.

**6. Willfulness Is a Common Question**

ChexSystems contends that willfulness is an individualized issue because it requires inquiry into what ChexSystems knew with respect to each class member's specific report. This is incorrect. Willfulness under the FCRA requires showing that the defendant either knowingly violated the statute or acted in reckless disregard of its requirements. *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007). That determination turns on what ChexSystems knew and did—not on anything about individual class members. ChexSystems either had or did not have the requisite knowledge and recklessness when it implemented its companywide policy of ignoring bankruptcy discharge data. That question has a single answer applicable to all class members.

This Court has repeatedly held that willfulness is a common question in FCRA class actions. *Berry v. LexisNexis Risk & Info. Analytics Grp., Inc.*, No. 3:11-CV-754, 2014 WL 4403524, at *13 (E.D. Va. Sept. 5, 2014), *aff'd sub nom. Berry v. Schulman*, 807 F.3d 600 (4th Cir. 2015); *Soutter*, 307 F.R.D. at 213-14; *Williams*, 2007 WL 2439463, at *6. The factors that bear on willfulness here—ChexSystems' awareness of the industry-standard White/Hernandez settlement requirements, its receipt of consumer complaints about this exact problem, this Court's October 2025 ruling allowing the willfulness claim to proceed, its complete failure to investigate available alternatives despite having LexisNexis bankruptcy data at hand, and its continued refusal to implement any bankruptcy verification procedure—all concern ChexSystems' conduct and knowledge uniformly, not any class member's individual circumstances.

ChexSystems' citation to *Soutter*, 498 F. App'x at 265, for the proposition that statutory damages "typically require an individualized inquiry" misreads that decision. The Fourth Circuit's observation in the first *Soutter* appeal arose in the context of a case where the defendant had implemented different procedures for different class members—making individualized inquiry genuinely necessary. Here, by contrast, ChexSystems had a single, uniform companywide policy:

do nothing to verify bankruptcy discharge status. *Soutter II* confirmed certification in exactly those circumstances—uniform policy, common violation, common statutory damages.

**C. PLAINTIFF SATISFIES RULE 23'S ASCERTAINABILITY REQUIREMENT**

**1. The Class Is Defined by Objective Criteria**

Critically, §727(b) of the Bankruptcy Code discharges all pre-bankruptcy debts (whether scheduled or not) with certain narrow exceptions. 11 U.S.C. §§ 523(a) and 727(b); *Bartenwerfer v. Buckley*, 598 U.S. 69, 72 (2023) ("The Bankruptcy Code . . . generally allows debtors to discharge all prebankruptcy liabilities, but it makes exceptions when . . . the creditor's interest in recovering a particular debt outweighs the debtor's interest in a fresh start."); *In re Rollison*, 579 B.R. 67 (Bankr. W.D. Va. 2018) ("[I]n a no-asset chapter 7 case, unless ordered otherwise, all of a debtor's prepetition debts – both those scheduled and those not scheduled – are discharged upon entry of the discharge order, except for those debts which are of the kind specified in section 523(a)(2), (4), or (6)."). Thus, any debt that existed on the filing date and was discharged qualifies, independent of how it was described or scheduled. The class is not defined by proof of the violation but by factual attributes of Chex's records.

Plaintiff's expert demonstrated that Chex's own QualiFile database contains the necessary fields (bankruptcy indicators, account status, balances, report dates) to filter these consumers. For example, Mr. Jaffe showed that one can query all reports with an attached bankruptcy code and a positive balance, then match those to consumer filing dates. Jaffe Dep. 45:12-47:12, Ex. 6. Thus, Jaffe's methodology relies on structured QualiFile data and publicly available bankruptcy records to identify class members through objective criteria. This is precisely the type of data-driven identification that satisfies ascertainability. *In re Petrobras Sec.*, 862 F.3d 250, 264-265, 269 (2d Cir. 2017 (Holding that the ascertainability doctrine "requires only that a class be defined using

objective criteria that establish a membership with definite boundaries" such that the "modest threshold requirement will only preclude certification if a proposed class definition is indeterminate in some fundamental way" and "declin[ing] to adopt a heightened ascertainability theory that requires a showing of administrative feasibility at the class certification stage.").

While the process is primarily data-driven, any individual records requiring confirmation can be evaluated using those same sources. Mr. Cox simply identified a different process, useful if some ambiguity remains (e.g. in unusual cases), by which those few accounts can be checked via public bankruptcy dockets. Cox Depo. 80:19-90:25; Cox Report, p.7. Determining whether a debt has been discharged is "straightforward, objective, and does not require subjective judgment," and can be confirmed by reviewing the bankruptcy docket and discharge order—"a process [that] should take under 5 minutes." Cox Report at 7. He further describes the discharge analysis as "straightforward and mechanical," based on standardized criteria such as the existence of a discharge order, the absence of an adversary proceeding, and the absence of a reaffirmation agreement. Id. at 10. These are uniform, record-based inquiries that can be applied consistently across class members. This approach is purely administrative, and certainly not a "mini-trial."

Determining Bankruptcy Discharge Status Is an Objective Inquiry, Not a Subjective Adjudication. ChexSystems' most sustained attack on ascertainability is its contention that identifying class members requires an impossibly complex, subjective "manual review" of bankruptcy dockets to determine whether each debt was actually discharged. This argument is both legally and factually wrong. As Plaintiff's bankruptcy expert H. David Cox, Esq. explains, and as ChexSystems' own data expert David Kalat conceded under oath, the question of discharge in a no-asset Chapter 7 case is governed by objective, docket-based criteria that are readily verifiable—

largely through automated processes. Any residual manual review is binary, ministerial, and, in Mr. Kalat's own words, "pretty much instant." The class is therefore eminently ascertainable.

A foundational principle of the Bankruptcy Code is providing the debtor with a "fresh start." As the Supreme Court has explained, "a central purpose of the [Bankruptcy] Code is to provide a procedure by which certain insolvent debtors can reorder their affairs . . . and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'" *Grogan v. Garner*, 498 U.S. 279, 286 (1991). Consistent with this purpose, a Chapter 7 discharge generally eliminates a debtor's personal liability for all prepetition debts. The exceptions are narrow, specific, and—critically for this case—objectively identifiable on the public docket.

Mr. Cox's declaration sets out the governing legal framework:

> Based on the statutory framework and applicable case law, the discharge in a no-asset Chapter 7 case does not depend on whether a debt was scheduled. The relevant inquiry is instead whether the debt falls within a self-executing exception to discharge or is of the kind described in § 523(a)(2), (4), or (6).
>
> An unpaid overdraft debt is not of a type encompassed by the self-executing discharge exceptions. Accordingly, for such a debt to be excepted from discharge, it must fall within § 523(a)(2), (4), or (6), which requires a judicial determination – typically through an adversary proceeding.
>
> The burden rests on the creditor, not the debtor, to establish that such an unscheduled debt falls within the exceptions provided in § 523(a)(2), (4), or (6).
>
> Unless and until such a determination is made, the debt is treated as discharged and subject to the discharge injunction.

(Ex. 9, Cox Decl. ¶¶ 27-30).

Mr. Cox unequivocally concludes: “Thus, in a no-asset Chapter 7 case, an unscheduled overdraft debt is discharged by operation of law upon entry of the discharge order unless and until a court determines that it falls within a statutory exception.” (Cox Decl. ¶ 31).

This is the settled law of this jurisdiction. In *In re Rollison*, 579 B.R. 67 (Bankr. W.D. Va. 2018), the Bankruptcy Court for the Western District of Virginia held: "[A] debt which was not scheduled in a chapter 7 no-asset case is subject to the discharge order unless it is a debt of the kind specified in section 523(a)(2), (4), or (6)." *Rollison*, 579 B.R. at 72. ChexSystems' own bankruptcy expert, Professor Eric Schaffer, confirmed the controlling legal premises at his deposition. He reviewed Ms. Riddick's docket and confirmed there was no reaffirmation agreement and no adversary proceeding. (Schaffer Dep. 15:10-16, Ex. 10). He confirmed it was a no-asset Chapter 7. (Schaffer Dep. 15:17-18, Ex. 10). And he agreed that until a creditor obtains court permission to challenge a discharge, the official status of the debt is discharged: "if, if you want to establish an exception to discharge, you have to go to court . . . [U]ntil that happens, it's discharged." (Schaffer Dep. 40:1-4, Ex. 10).

Identifying class members, therefore, does not require probing a debtor's subjective intent, evaluating unscheduled debts, or making complex legal adjudications. It simply requires querying objective, public dockets for the presence of a discharge order and the absence of a reaffirmation agreement or adversary proceeding—a determination ChexSystems' own experts acknowledged is largely automatable.

**2. ChexSystems Has Not Produced Evidence of a Predominant Number of Incorrectly Included Persons**

ChexSystems' central ascertainability argument is that because some debts in the class may not actually have been discharged—due to exceptions such as reaffirmation agreements, fraud, or adversary proceedings—the class is not ascertainable. This is the same theoretical overinclusion argument that courts in this Circuit have uniformly rejected absent concrete evidence of a predominant number of incorrectly included persons.

In *Soutter*, this Court rejected Equifax's identical argument, holding that the relevant question is whether the number of incorrectly included persons is "great," "certification-defeating," or "predominant"—not whether theoretical overinclusion is conceivable. *Soutter*, 307 F.R.D. at 197-98. The court expressly held that "courts do not look favorably upon the argument that records a defendant treats as accurate for business purposes are not accurate enough to define a class." *Id.* at 198. The same principle applies with equal force here.

ChexSystems has had full access to all of the class data throughout this litigation. Its own experts have combed through Mr. Jaffe's sample. Yet ChexSystems has not produced a single concrete example of a person in the proposed class whose debt was not actually discharged in bankruptcy. It has identified theoretical categories of exceptions—fraud debts, reaffirmed debts, asset bankruptcies with unscheduled debts—but has provided no evidence that a predominant number, or even a significant number, of class members fall into those categories. The class definition itself addresses the principal exceptions: it excludes accounts subject to reaffirmation agreements and accounts subject to adversary proceedings finding non-dischargeability. Fraud debts and unscheduled asset bankruptcy debts remain theoretical concerns for which ChexSystems has produced no evidence of significant presence in the class.

Every court known to the undersigned to consider circumstances as here—a CRA defendant comes up with theoretical reasons why limitations on class data may cause the overinclusion of persons who do not meet the definition—has rejected the complaint absent tangible or actual evidence that such persons exist in large numbers. Defendant's strategy is the same as every other defense team opposing these FCRA cases. Equifax argued the same issues in *Soutter,* even the second time around with a postappeal narrowed definition. *Soutter v. Equifax Info. Servs*., LLC, 307 F.R.D. 183, 196 (E.D. Va. 2015); see also *Patel v. Trans Union, LLC*, 308

F.R.D. 292, 302 (N.D. Cal. 2015); *Rivera v. Equifax Info. Servs., LLC*, 341 F.R.D. 328, 345 (N.D. Ga. 2022). As here, those CRAs did not produce any actual instances of the data failure or establish that the Plaintiff's method of identification need not be "comprehensive." Instead, the court rejected such a requirement and found that where the defendant has not identified any instances of persons who should not be in the class, the class issues still predominate over the administrative burden of identification. The question is whether the number of actual failures is significant and a "predominant number." As a sister District Court explained in rejecting the same theoretical arguments:

> The defendants' implied argument is that a significant number of the proposed class actually may have been accurately tagged as potential terrorists. Absent some pretty significant proof to the contrary, the court is willing to assume that no significant (read: certification-breaking) fraction of the tagged proposed class was in fact accurately tagged as potential terrorists. ... The (undisputedly) problematic name-only logic and the sheer number of hits makes the court's approach tolerable unless, again, the court is to start from the working assumption that a predominant number of class members tagged with alerts, based on their names only, were in fact accurately tagged as potential terrorists.

*Patel,* 308 F.R.D. at 302 (bold added). Similarly, the District of Maryland rejected such theoretical challenges where, "RentGrow has not identified an individual who it believes is a match" and was not "certification-defeating" unless a "critical mass of accurately matched individuals." *Fernandez v. RentGrow, Inc.*, 341 F.R.D. 174, 208 (D. Md. 2022), *vacated on other grounds and remanded,* 116 F.4th 288 (4th Cir. 2024). The court again followed the same standard, requiring to prevent certification, overinclusion of "a predominant number of the proposed class" that it saw "based on the record before it." Id. (quotation omitted); see also *Ramirez v. Trans Union*, LLC, 301 F.R.D. 408, 422 (N.D. Cal. 2014): ("The record before the Court does not support Trans Union's argument. Trans Union is unable to identify any instance in which a person it identified as a 'potential match' was in fact a match. Indeed, it has not identified a single instance in which

the birth date of the person on the OFAC List and the 'potential match' matched, or even the address matched; in other words, in which there is something other than the person's name to suggest the person is on the OFAC List."); *Rivera*, 341 F.R.D. at 345 (Adopting these decisions where without proof of specific failures, there was not an 'overbroad class definition', which would be one of a "great many persons[.]") (cleaned up).

The point is that a defendant challenging the determination of class membership must do more that show that the class as defined is not "comprehensive" and could at that stage include greater than zero persons who should not be in the class.

**3. PACER's Limitations Do Not Preclude Class Identification**

ChexSystems' own data expert, David Kalat, thoroughly dismantled the claim that automated PACER searches are infeasible, conceding—step by step—that the very steps ChexSystems claims are impossibly complex can be automated using Python scripts and APIs:

> Q. [C]an one straightforwardly determine whether a bankruptcy is Chapter 7 from the structured data that one returns from the public API?
> A. That is straightforward.
>
> Q. And we've already agreed that determining whether it's a no asset or an asset bankruptcy, that also can be automated; right?
> A. It's a different automation, but it can be.
>
> Q. Do you agree that you can do an automated textual search for whether a docket sheet has the phrase 'reaffirmation agreement' in it?
> A. You can do that.
>
> Q. Same thing for adversary proceedings; right?
> A. Yes.

(Kalat Dep. 37:9-14, 46:7-9. 46:12-21, Ex. 11).

Mr. Kalat further admitted that Python code "did" determine asset versus no-asset status in this very case (Kalat Dep. 32:17-19, Ex. 11), that he has never seen an instance where alternate language was used instead of "reaffirmation agreement" on a docket (Kalat Dep. 40:2-8, Ex. 11),

and that PACER bulk searches should properly be run after hours to avoid load issues (Kalat Dep. 91:9-12), with searches well within PACER's technical limits.

Mr. Jaffe's Rebuttal Report further confirms that the automated methodology is highly effective and scalable. In 2024, only of Chapter 7 cases involved any reaffirmation agreement, only of those were explicitly approved, and adversary proceedings occurred at a rate of —meaning the exceptions ChexSystems theorizes about are statistically microscopic. Mr. Jaffe concludes:

(Jaffe Rebuttal ¶ 19, Ex. 12).

Moreover, ChexSystems already holds the answer for approximately 90 percent of class members within its own database. Mr. Kalat confirmed that roughly 90 percent of the records Mr. Jaffe identified as meeting the bankruptcy criteria corresponded to a LexisNexis bankruptcy record already present in ChexSystems' QualiFile data. (Kalat Dep. 69:12-16, Ex. 11). For the vast majority of class members, no independent PACER search is even required.

**4. ChexSystems' Attack on Mr. Jaffe's Analysis Goes to Merits, Not Ascertainability**

ChexSystems offers lengthy criticism of Mr. Jaffe's expert methodology—his focus on discharge dates rather than petition dates, his failure to account for asset bankruptcy exceptions, his alleged violation of PACER's data limitations. These are criticisms for a Daubert motion or for trial, not for class certification. The question at certification is not whether Mr. Jaffe's analysis is perfect—it is whether an administratively feasible process for identifying class members exists. Mr. Jaffe has demonstrated that the relevant data exists and can be matched by algorithm. That is sufficient.

ChexSystems' claim that Mr. Jaffe's PACER methodology violated PACER's terms of use is simply false. Practitioners regularly build and maintain structured databases using PACER data, and third-party vendors such as LexisNexis, Westlaw, and FIS already possess comprehensive bankruptcy databases built from exactly this data. ChexSystems is itself already connected to LexisNexis through its RiskView relationship and has access to certain bankruptcy attributes. The contention that a bankruptcy matching process is impractical or legally prohibited is contradicted by the existence of multiple commercial providers who have already performed it at scale.

As to the sample itself: ChexSystems repeatedly characterizes Mr. Jaffe's work as a "representative sample" intended to calculate a reliable error rate. This misrepresents the basis on which the sample was produced. The parties agreed to a discovery compromise in which ChexSystems would produce a limited sample of records to allow Plaintiff to demonstrate that class members could be identified and that the class was sufficiently numerous to proceed—not to calculate a statistically valid error rate. Mr. Jaffe's analysis was never intended as a merits analysis, and ChexSystems cannot use a discovery limitation it helped negotiate to undermine the certification showing it was designed to support.

**5. The Class Definition Refinements Are Permissible and Do Not Defeat Certification**

ChexSystems recycles its arguments it first made in opposition to Plaintiff's pending Motion for Leave to Amend Complaint in order to argue that Plaintiff's proposed class is not ascertainable. First, it asserts that Plaintiff's class is not defined by objective, administratively feasible criteria, and second, it again complains that Plaintiff "radically" changed the class definition post-discovery. Both claims are incorrect as a matter of law and evidence. The proposed class can be identified from ChexSystems' own data, and any needed refinements are lawful and in fact anticipated by Rule 23(c)(1).

Chex asserts Plaintiff "has not defined an ascertainable class", implying no clear way to identify members. In truth, the class is defined by clear, objective criteria: (a) ChexSystems reports furnished within two years of suit; (b) those reports showed a debt with an outstanding balance or "past due" status on an account that existed as of the consumer's Chapter 7 filing date; (c) that bankruptcy resulted in a discharge; and (d) the debt was *not* reaffirmed or held non-dischargeable. These criteria come directly from Plaintiff's proposed class definition and the evidence. And to the extent the Court concludes there is an ascertainability distinction as to other nits – such as the rare Chapter 7 that is not a "No Asset" case, it should and is duty-bound to adjust the certified definition accordingly.

Specifically, Plaintiff removed the "scheduled debt" limitation from the prior definition in response to evidence that ChexSystems' own records do not distinguish between scheduled and unscheduled debts, and added the reaffirmation and adversary proceeding exclusions to address precisely the concerns ChexSystems was raising about exceptions to discharge. These refinements *narrow and clarify* the class; they do not change its fundamental character.

Defendant's contention that Plaintiff has impermissibly or "radically" altered the class definition post-discovery simply recycles the same arguments it previously raised in opposing Plaintiff's Motion for Leave to Amend. (ECF 105). Plaintiff fully addressed those arguments in her briefing on that motion and incorporates that analysis here. (ECF 107). Importantly, none of the refinements here introduce new legal theories; they merely ensure that every class member fits the claim. By excluding reaffirmed or non-dischargeable debts, the definition matches the statutory scope of the Chapter 7 discharge. Chex had full notice in discovery of the factual basis for these refinements (Plaintiff's interrogatory answers and expert reports discuss them). (See, e.g., ECF No. 105, p. 11 (quoting Plaintiff's discovery response and citing ECF No. 105-4, p. 3)). As Plaintiff

already explained in her briefing on the proposed Amended Complaint, the proposed definition is actually narrower than the original: it excludes consumers whose debts were not discharged due to exceptions. Thus it cannot prejudice Defendant.

Refinement of a class definition in light of the evidentiary record is not improper—it is expected. Courts adjust or refine class definitions to resolve administrative issues rather than deny certification. *Henderson v. Corelogic Nat'l Background Data, LLC*, No. 3:12CV97, 2016 WL 4611571, at *4 (E.D. Va. Sept. 2, 2016), citing *inter alia Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir. 1993) (noting that the court is "not bound by the class definition proposed in the complaint") and *Kalow & Sprinqut, LLP v. Commence Corp.*, 272 F.R.D. 397, 402 (D.N.J. 2011) (holding that "Plaintiff is not bound by the class definitions proposed in its Amended Complaint, and the Court can consider Plaintiff's revised definitions, albeit those revisions are made in its motion for class certification"). There is abundant precedent in this District establishing the Court's discretion to do the same in this case. *See, e.g. Williams v. LexisNexis Risk Mgmt. Inc.*, No. 3:06-cv-241, 2007 WL 2439463, *10 (E.D. Va. Aug. 23, 2007) (narrowing class definitions based on defense arguments and certifying narrowed class); *Davis v. Cap. One, N.A.*, No. 1:22-cv-903-AJT-IDD, 2023 WL 6964051, *3 (E.D. Va. Oct. 20, 2023) ("The Court first considers, as a preliminary matter, the appropriate scope of the class and whether to narrow Plaintiff's proposed class definition, as the Court must ascertain for itself that "every class member . . . have Article III standing for each claim that they press."); *Taliaferro v. State Council of Higher Ed.*, 372 F. Supp. 1378, 1388 (E.D. Va. 1974) (narrowing the class definition to remove certain conspiracy claims); *EQT Prod. Co. v. Adair*, 764 F.3d 347, 360 (4th Cir. 2014) (remanding with instructions to the district court to "determine whether it is possible to adjust the class definitions to avoid or mitigate the administrative challenges we have identified."); *see also Doe v. Chao*, 306 F.3d 170, 185 n.1

(4th Cir. 2002), aff'd, 540 U.S. 614, 124 S. Ct. 1204 (2004) (observing that when the proposed class definition contains a defect, a district court may narrow the class definition on its own initiative).

Plaintiff's proposed definition reflects the facts developed through discovery, including the structure of ChexSystems' data and the objective criteria that govern discharge. In any event, the Court retains discretion to fashion an appropriate class definition based on the record, and Defendant's recycled objections provide no basis to conclude otherwise. Here, the definition reflects exactly what evidence shows: discharged debts improperly reported. Nothing in ChexSystems' arguments undermines this. The number of prior bankruptcies a plaintiff has or minor mismatches in schedules are irrelevant to discharge or to the class criteria. Nor does ChexSystems' lender-customer "Accept/Reject" code matter, since banks decide whether to approve accounts on their own criteria. The only operative facts are those captured in ChexSystems' report and the bankruptcy order. To the extent ChexSystems suggests this requires "manual review" of thousands of files, Plaintiff's experts proved otherwise: with modern database queries, the vast majority of class members can be identified electronically. Any limited manual follow-up (e.g. confirming a potential reaffirmation flag) would involve only a few cases, not every member.

**6. The Administrative Process for Identifying Class Members Is Manageable**

This Court has repeatedly rejected the argument that the need for some manual review defeats ascertainability. *Soutter*, 307 F.R.D. at 196-97. When asked directly how long it takes a human to verify a docket hit, Mr. Kalat's answer destroyed ChexSystems' burden argument entirely:

> Q. So you get a result back that says reaffirmation agreement. How long does it take a human to determine that it actually is reaffirmation agreement within the

> docket text? A. You'd scan it, and you'd see it. Q. Instant, pretty much; right? A. However long it takes to read it.

(Kalat Dep. 55:3-9, Ex. 11).

This Court and the Fourth Circuit have consistently held that the need for limited manual review does not defeat ascertainability. *Soutter*, 307 F.R.D. at 197 ("[R]ecourse to manual, member-by-member review" of binary questions does not render the inquiry subjective because "most of the determinations are readily discernible and almost always binary."). Confirming the presence or absence of an adversary proceeding or reaffirmation agreement on a public docket is the textbook definition of a readily discernible, binary determination.

**D. RULE 23(b)(3): SUPERIORITY**

ChexSystems offers only a perfunctory superiority objection: that individual litigation is preferable because the FCRA's statutory damages make individual suits viable. This Court has uniformly rejected that argument in FCRA class actions. *See, e.g., Soutter*, 307 F.R.D. at 217; *Berry*, 2014 WL 4403524, at *13; *Williams*, 2007 WL 2439463, at *9. Statutory damages of $100–$1,000 per violation are "too slight to support individual suits." *White v. E-Loan, Inc.*, No. C05-02080SI, 2006 WL 2411420, at *9 (N.D. Cal. Aug. 18, 2006).

ChexSystems' Eighth Circuit argument—that it would be improper to certify a nationwide class because binding Eighth Circuit precedent provides it a complete defense in certain jurisdictions—does not support denying certification. That is not a state-specific or circuit-specific substantive argument; it is a venue complaint. The FCRA is a federal statute with uniform national requirements. ChexSystems cannot use its choice of circuit to deny class members in other jurisdictions their day in court. Moreover, *Rydholm* is readily distinguishable: unlike in *Rydholm*, ChexSystems here had actual notice of the bankruptcy-reporting problem through consumer complaints, the White/Hernandez settlement standards, and this Court's own ruling sustaining

Plaintiff's willfulness claim. The existence of a contrary out-of-circuit decision goes to the merits—it is not a basis for defeating class certification.

## IV. CONCLUSION

ChexSystems has a simple defense to this class action: it did nothing to ensure that debts it reports as currently owed are not, in fact, debts that have been discharged in bankruptcy because it was not required to do so under the law. That defense—"we had zero procedures"—is common to every class member. Whether that defense saves ChexSystems or condemns it is the core question of this litigation, and it has a single answer applicable to all class members in one proceeding. That is what class actions are for. The Court should grant Plaintiff's Motion for Class Certification, certify the proposed class, appoint Ms. Riddick as class representative, and appoint Consumer Litigation Associates, P.C. as class counsel.

Respectfully submitted,

**PLAINTIFF,** ***individually and on behalf of all others similarly situated***

By: */s/ Leonard A. Bennett*

Leonard A. Bennett, VSB #37523
Craig C. Marchiando, VSB #89736
Mark C. Leffler, VSB# 40712
Emily Connor Kennedy, VSB #83889
Consumer Litigation Associates, P.C.
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com
Email: craig@clalegal.com
Email: mark@clalegal.com
Email: emily@clalegal.com

*Counsel for Plaintiff*